# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

In re:

     Hampton Lake, LLC,

          Debtor.

Case No. 13-02482-jw

Chapter 11

---

### DEBTOR'S AMENDED PLAN OF LIQUIDATION

Filed by the Debtor-in-Possession on December 2, 2013

---

**Submitted by**:    MCCARTHY LAW FIRM, LLC
G. William McCarthy, Jr., I.D.#2762
Daniel J. Reynolds, Jr., I.D.#9232
Sean P. Markham, I.D.#10145
W. Harrison Penn, I.D.#11164
*Attorneys for the Debtor*
1517 Laurel Street
P.O. Box 11332
Columbia, SC 29201-1332
(803) 771-8836
(803) 765-6960 (fax)

**THIS PLAN PROVIDES FOR RELEASES BY THE CHARTER NOTE HOLDERS AGAINST HAMPTON LAKE FUNDING, LLC, AND ITS AFFILIATES, REED DEVELOPMENT, INC. AND JOHN P. REED, WHO ARE PROVIDING SUBSTANTIAL CONSIDERATION TO THE ESTATE BY SUBSTANTIALLY COMPROMISING A VALUABLE SECURED CLAIM AGAINST THE DEBTOR. THE RELEASES ARE FURTHER DESCRIBED AND DEFINED IN ARTICLE XIII OF THIS PLAN. IF THIS PLAN IS CONFIRMED, THE PARTIES IDENTIFIED IN THESE PROVISIONS OF THIS PLAN WILL BE RELEASED FROM THE CLAIMS OF ANY CHARTER NOTE HOLDER.**

## Table of Contents

Page

Article I        History and Other General Information Relating to the
                 Proposed Plan of Liquidation ------------------------------------------    3

Article II       Property of the Debtor -------------------------------------------------    7

Article III      Plan of Liquidation ----------------------------------------------------    9

                 Plan Classifications and Treatment------------------------------    12

Article IV       Feasibility of Plan and Means of Effectuation --------------------------    21

Article V        Conditions Precedent and Implementation of the Plan ---------------------    22

Article VI       Claims Bar Date, Claims Objections, and Post-Confirmation Status -----    22

Article VII      Executory Contracts --------------------------------------------------    24

Article VIII     Tax Consequences -----------------------------------------------------    24

Article IX       Jurisdiction ------------------------------------------------------------    25

Article X        Post-Confirmation Acts -----------------------------------------------    25

Article XI       Cram-Down for Impaired Creditors Not Accepting the Plan ---------------    26

Article XII      Discharge of the Debtor -----------------------------------------------    26

Article XIII     Third Party Releases --------------------------------------------------    26

## DEBTOR'S PLAN OF LIQUIDATION

Hampton Lake, LLC   (the "Debtor") proposes the following Plan of Liquidation ("Plan") pursuant to Chapter 11 of the U. S. Bankruptcy Code.   The Debtor filed its Disclosure Statement (the "Disclosure Statement") on May 3, 2013, which was subsequently amended on June 17, 2013.   The Court entered an Order Approving Debtor's Disclosure Statement (as amended) on June 24, 2013, and the Debtor believes and asserts the Disclosure Statement contains adequate information for Claim and Equity holders to make a decision on the Plan.   The approved Disclosure Statement and its Exhibits, including any amendments or addendums thereto, are hereby specifically incorporated in this Plan by reference.

## ARTICLE I

### History and Other General Considerations Relating

### to the Plan of Liquidation

1.    Background.   The history and background of the Debtor is provided in the Debtor's Disclosure Statement filed on May 3, 2013.

2.    Financial Condition of the Debtor.   The current financial condition of the Debtor is set forth in the Debtor's bankruptcy schedules.

3.    The Debtor's Proceedings under Chapter 11.    The Disclosure Statement provides an adequate history of the Debtor, description of the proceedings by the Debtor in this Case, and description of this Plan.

4.    Definitions.   The following words, terms and definitions shall be used and apply exclusively for this Plan:

      a.    Acceptance.   A specific class of claims has accepted a plan when such plan has been accepted by those voting individual creditors in that class that hold at least two-thirds (2/3) in amount (of money) and more than one-half (1/2) in number (greater than 50%) of the voting individual allowed claims of that class of creditors.   A class of interest has accepted a plan if such plan has been accepted by holders of such interest that hold at least two-thirds (2/3) in amount of the allowed interest of such class held by holders of such interest (i.e., number of shares held by shareholders or partners) that have voted in confirmation of such plan.   It is important to note that computation in the confirmation voting process is based only upon the total amount of claims actually voting rather than on claims proven and allowed.   Notwithstanding any other provision of this section, a class that is unimpaired under this Plan is deemed by law to have accepted this Plan, and solicitation of acceptances with respect to such class is not otherwise required.

      b.    Allowed Claim shall mean each individual creditor's claim or claim of interest whose validity is accepted by the Debtor for payment, or if

challenged by the Debtor, a claim which is ultimately proved by the claimant and approved by the Court after notice.  Some claims by law can be approved only by the Court for payment, e.g., administrative and priority claims.

c.    <u>Cash on Hand</u> shall refer to that cash available, on or immediately after confirmation, and which is in the hands of the Debtor, and has been derived from the total operations of the Debtor.

d.    The <u>Case</u> shall mean chapter 11 case no. 13-02482-jw and shall generally refer to the proceedings of the Debtor under this chapter 11, which Case commenced in this Court on April 29, 2013.

e.    <u>Chapter 7</u> shall mean a hypothetical case administered under 11 U.S.C. Sections 701 <u>et seq.</u>, wherein an estate, identical to the Debtor's, with identical assets and liabilities, has its assets liquidated.

f.    <u>Chapter 11</u> shall mean a case being administered under 11 U.S.C. Sections 1101 <u>et seq.</u>, for the reorganization or liquidation of the indebtedness of a debtor, and the continued operation of its business.

g.    The <u>Charter Note Holders</u> shall refer to those 65 persons who, pre-petition, entered into promissory notes with the Debtor and loaned funds to the Debtor under the Debtor's Charter Investor Offering governed by the Confidential Offering Memorandum dated September 16, 2005, which is attached to the Disclosure Statement as Exhibit A.  The Charter Investors assert aggregate unsecured, non-priority claims of principal and interest aggregating approximately $26,281,859.50 against the Debtor as of the Petition Date.

h.    A <u>Claim of Interest or "Equity Interest"</u> (more particularly) shall mean any claim for equity ownership, whether actual, or contingent. "Interest" refers to equity securities (shareholders' interest), partnership interest or proprietorship interest.

i.    <u>Claims</u> shall mean any right or claim to a right to receive payment of monies from the Debtor or right to an equity interest in the Debtor held by any party.

j.    <u>Claims Bar Date</u> shall mean the last day for filing Claims or a Claim of Interest against the Debtor's estate in this Case.  Unless otherwise ordered by the Court, the Claims Bar Date shall be <u>August 22, 2013 for all creditors except governmental units</u> and shall be <u>October 28, 2013 for a governmental unit</u> as such dates were set forth in the Court's Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, & Deadlines issued on the Petition Date in this Case.

k.    <u>Class of Claims</u> shall mean all types of claims or interests (e.g., secured, priority, unsecured or Claims of Interest) which are substantially identical in kind or nature and are grouped together without any unfair discrimination or treatment for payment by this Plan.

l.    The <u>Code</u> is 11 U.S.C. Sections 101, <u>et seq.</u>, also referred to as the "Bankruptcy Code".

4

m.      <u>Confirmation</u> of this Plan shall be effective when the signed Order Confirming Plan is filed by the Court to implement the proposed Plan, after the Court has found that the Plan: (1) has been accepted by the requisite number of creditors and parties in interest eligible to vote thereon, (2) is feasible, (3) is fair and equitable, (4) does not unfairly discriminate, and (5) meets all of the other requirements of 11 U.S.C. Sections 1123, 1126 and Section 1129, and the Order Confirming Plan is entered.

n.      The <u>Court</u> shall mean the United States Bankruptcy Court for the District of South Carolina.

o.      The <u>Debtor</u> shall mean Hampton Lake, LLC, the debtor in Chapter 11 Case No. 13-02482-jw.

p.      The <u>Disclosure Statement</u> shall mean the Debtor's Disclosure Statement filed on May 3, 2013, including any subsequent amendments or addendums thereto.    The Court entered an Order Approving the Disclosure Statement (as amended) in this matter on June 24, 2013.

q.      The <u>"Effective Date" or "Effective Date of Confirmation"</u> for cash distribution purposes as it is referred to in this Plan, shall mean the day that is fifteen (15) days after entry of the Court's Order Confirming Plan unless any Order Confirming Plan shall be appealed, in which case the Effective Date shall be the day after any Order Confirming Plan shall become a final, unappealed order.

r.      <u>Executory Contracts</u> shall mean all contracts or agreements with duties owing by each of the parties to such contracts or agreement, which duties remain to be performed or satisfied by the parties in the future.

    i.      <u>Personalty Leases</u> shall mean all leases between the Debtor and third parties for the use of any and all personal property.

    ii.     <u>Realty Leases</u> shall mean all valid, enforceable leases of real estate between the Debtor and other parties.

s.      <u>Final Consummation</u> shall refer to the date and time at which the execution of all provisions of the Plan, appropriate provisions of the Bankruptcy Code, and applicable supplemental orders issued by the Bankruptcy Court have been fully complied with and accomplished.

t.      <u>Gross Sales Proceeds</u> shall refer to the gross contract sales price without any reductions for costs of sale, including without limitation closing costs, apportionments, incentives, reimbursements, or any other deductions.

u.      <u>Hampton Funding</u> shall mean Hampton Lake Funding LLC, an affiliate of the Debtor who asserts a second priority mortgage on the Debtor's real property.

v.      An <u>Impaired</u> class shall mean a class of claims given, under this Plan, less than the full amount of their filed and approved individual claims or

5

claims where contract rights are modified or compromised by the Plan.

w.    The <u>Petition Date</u> shall mean the date on which this Case was filed with the Court, April 29, 2013.

x.    The <u>Plan</u> shall mean this Debtor's Amended Plan of Liquidation under chapter 11, filed with the Court on December 2, 2013, including any subsequent amendments or addendums thereto.

y.    <u>Priority and Administrative Claims</u> shall mean all claims entitled to priority status under 11 U.S.C. Section 507 and Section 364 or other specific provisions of the Code. These claims include, but are not limited to, generally, all costs and expenses incurred during the liquidation or reorganization proceeding; all wages allowed priority status which were owing by the Debtor at the time of filing up to $12,475 per claimant; all post-petition wage claims due at confirmation; all taxes owing to the United States, any individual State or local taxing authority; all post-petition debts incurred and unpaid since the commencement of this Case; and all other statutory costs or fees assessed or assessable by the Court, and any claims given priority status during this proceeding by specific order of the Court.

z.    <u>Reed</u> shall mean John P. Reed, the President and Chief Executive Officer of the Debtor's Manager, Reed Development, and an Equity Interest Holder of the Debtor.

aa.    <u>Reed Development</u> shall mean Reed Development, Inc., the Debtor's Manager as set forth in the Debtor's Operating Agreement.

bb.    <u>SABAL</u> shall mean Crimson Portfolio, LLC and its authorized agent SABAL Financial Group LP. Crimson Portfolio, LLC is the assignee of the Debtor's original lender, Synovus, and the entity that alleges a first priority mortgage and liens on substantially all of the Debtor's assets.

cc.    <u>Secured Claim</u> shall mean each individual claim completely or partially secured by real estate mortgages, security agreements, assignment agreements, consignment agreements, chattel mortgages, recorded lease-purchase agreements, liens or any other legal encumbrance which is entitled to secured status under Title 36 of the Code of Laws of South Carolina (UCC provisions) or South Carolina law.

dd.    <u>Substantial Consummation</u> shall refer to that date and time on which the transfer of all or substantially all of the property proposed by the Plan to be transferred has been achieved; the assumption by the Debtor under the Plan of the business or of the management of all or substantially all of the property dealt with by the Plan has been achieved; and, finally, the commencement of the distribution of some payments under the Plan has begun.

ee.    An <u>Unimpaired</u> class shall mean a class of claims whose rights are not affected by this Plan, or which is entitled to and shall receive under this Plan full satisfaction of its filed and Allowed Claims as required by the Code. Unimpaired claims are deemed to have accepted this Plan by specific provision of the Code and solicitation of acceptances with

respect to such class from the holders of claims or interest of such class is not required.

ff.    <u>Unsecured Claims</u> shall mean all claims against the Debtor other than Secured Claims, Priority and Administrative Claims, or Claims of Interest.

**NOTE:**  <u>The defining of the various parties of interest and claimants against this estate in no way imputes any relative priority among them nor is it to be construed to validate or approve any of their claims.  Any and all terms not defined hereinabove shall be read to have the meanings specifically set forth herein below or to otherwise have their most common every day meaning where definitions are not specifically set forth herein.</u>

## ARTICLE II
## Property of the Debtor

<u>**Primary Assets**</u>

As of the Petition Date, the Debtor's assets consisted primarily of 235+/- lots in Hampton Lake Subdivision in Bluffton, South Carolina, 19.5 acres of commercial property, and the Hampton Lake Subdivision common property, including a club facility, boathouse, spa and fitness center, and a 165-acre freshwater lake (the "Subdivision Property").  At the Petition Date the Subdivision Property had a gross retail value of approximately $22,766,300 as shown in the Debtor's schedules.[1]  The Debtor intends to market and sell its remaining developer lots and commercial property over the term of its Plan.  At the end of the Plan term, the Debtor will transfer the club facility, boathouse, and the spa and fitness center to the Hampton Lake Property Owners Association free and clear of any liens, claims or encumbrances in accordance with the applicable covenants to the Subdivision Property.  Additionally, the Debtor will transfer the 165-acre freshwater lake to the Lake Maintenance Corporation free and clear of any liens, claims or encumbrances in accordance with applicable covenants at the end of the Plan term. The Debtor will also transfer the shared entry road to the Hampton Lake Road Association, Inc. free and clear of any liens, claims or encumbrances in accordance with applicable covenants at the end of the Plan term.

Additionally, at the Petition Date the Debtor had cash/accounts of approximately

---

[1]    The $22,766,300 value for the Debtor's real property is the Debtor's best estimate of the gross retail value (without deducting any commissions, sales or marketing costs) of its developer lots and commercial properties assuming they were all to sell in 2013.  The Debtor's opinion of the gross retail value is based upon its senior management team's approximately 100 years of combined real estate development and sales experience in and around the Hilton Head, South Carolina area.  The values of the Debtor's personal property are also based upon the Debtor's best estimate of the market value of such personal property as of the Petition Date.

$765,000, of which approximately $150,000 were monies being held in escrow as refundable architectural review board deposits. At the Petition date the Debtor also had receivables in the approximate amount of $72,000, furnishings and fixtures worth approximately $16,400, and machinery and equipment worth approximately $7,400. The approximately $765,000 in cash and accounts are collateral of SABAL and are being used in accordance with an approved cash collateral budget. The approximately $72,000 in accounts receivables, which are primarily comprised of commission advances to sales agents, are collectible if the Debtor's business affairs are conducted in accordance with the Plan. The approximately $67,000 of sales agent advances will be reduced as properties are closed post-petition. The aggregate approximately $25,000 in furniture, fixtures, machinery and equipment are expected to have little to no value at the end of the Plan term. Subject to SABAL's consent to the release of its lien, the Debtor proposes to transfer the furniture, fixtures, machinery and equipment items to the homeowners association at the end of the Plan.

The Debtor also holds a 100% ownership interest in Hampton Lake Realty, LLC ("HL Realty"), which has an unknown value, and also has a 100% interest in Vacation Townhomes, LLC ("Townhomes"), a defunct subsidiary without any assets. HL Realty is currently the Debtor's sales arm, and it is undetermined if HL Realty has any value beyond the term of the Plan. At the end of the Plan term, if it is determined that HL Realty has substantial value, it will be marketed and sold, with the proceeds thereof going to SABAL. Otherwise, HL Realty will be extinguished as a defunct entity at the end of the Plan term. It is anticipated that Townhomes will be extinguished as a defunct entity at the end of the Plan term.

Though its value, if any, is unknown, the Debtor also holds any and all rights created by The Community Charter for the Hampton Lake Subdivision (the "Community Charter"), which document is attached to the Disclosure Statement as **Exhibit C** and was recorded on March 31, 2006 in the Beaufort County, South Carolina register of deeds plat book 02347, pages 1593-1694. The Community Charter sets forth certain declarant rights (the "Declarant Rights") applicable to the project, which are set forth in detail in the Disclosure Statement's **Exhibit C**. The Declarant Rights will remain with the Debtor until the end of the Plan term and will remain subject to the lien of SABAL. If the Debtor makes all of the payments to SABAL contemplated in the updated Feasibility Budget attached hereto as **Exhibit A**, then SABAL will consent to the assignment of the Declarant Rights to Hampton Funding, or its assigns, by the Debtor free and clear of any liens, claims or encumbrances at the end of the Plan in exchange for Hampton Funding's subordination of its $2,290,835 second priority note and mortgage. In addition,

SABAL, the Debtor and JPR Properties, Inc. (an affiliate of the Debtor) have also agreed to the Declaration of Easements and Covenant to Share Costs for Hampton Lake attached hereto as **Exhibit B**, which will be executed and recorded with the office of the Register of Deeds for Beaufort County, South Carolina upon confirmation of the Plan. Notwithstanding any future change in ownership of rights to the name "Hampton Lake" and the logo associated with the same, the Debtor and JPR Properties, Inc. or its assigns ("JPR"), as well as the associations of property owners for the Debtor's development and for JPR's development shall each have the right to use the words "Hampton Lake" in their respective names and to use the name and logo associated with Hampton Lake in printed or promotional materials, including websites, in connection with the marketing, sale, management and operation of their respective developments or portions thereof.

**Bankruptcy and Other Causes of Action**

The Debtor is in the process of reviewing its financial records with regard to whether the Debtor has any causes of action pursuant to 11 U.S.C. §§ 547, 548, 549, and 550 ("Chapter 5 Causes of Action"). Chapter 5 Causes of Action may specifically include, but are not limited to, any of the transactions described in more detail in the Debtor's Statement of Financial Affairs ("SoFA") filed by the Debtor as part of its Bankruptcy Schedules (Docket Item # 1 in this Case, beginning on page 49 of 66). For a detailed listing that describes the primary transactions that could give rise to Chapter 5 Causes of Action please refer to the Disclosure Statement's **Exhibit D**, including any amendments or addendums thereto, which is hereby specifically incorporated in the Plan by reference. The Debtor does not believe that it has any recoverable Chapter 5 Causes of Action. **The Debtor specifically reserves all of its rights related to any Chapter 5 Causes of Action that are determined to exist.**


## ARTICLE III

### Plan of Liquidation

**Claims**

Unless otherwise ordered by the Court, the Claims Bar Date was **August 22, 2013 for all creditors except governmental units** and was **October 28, 2013 for a governmental unit** as such dates were set forth in the Court's Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, & Deadlines issued on the Petition Date in this Case. Unless specifically ordered

otherwise by the Court, only Claims scheduled by the Debtor without any contingent, unliquidated, or disputed notations and those Claims filed on or before the Claims Bar Date shall constitute Claims asserted against the Debtor in this Case.  Any Claims filed after the Claims Bar Date shall be automatically disallowed unless the claimant successfully obtains an order of the Court allowing their late-filed proof of claim.

**THE RIGHT TO OBJECT TO ANY SCHEDULED OR ASSERTED CLAIMS PRIOR TO THE CLOSING OF THE BANKRUPTCY CASE ARE HEREBY SPECIFICALLY RESERVED, EXCEPT AS PREVIOUSLY ALLOWED BY A FINAL ORDER OF THE COURT OR EXPRESSLY ALLOWED UNDER THE TERMS OF THIS PLAN.**

## Description of the Plan

The Debtor is an operating entity that creates cash flow through the sales of real estate. The Debtor's Plan contemplates the Debtor continuing in operations until December 31, 2015 in order to collect its accounts and sell off its remaining real property.[2]  The Debtor's Plan proposes the continued sales of its real property holdings in the ordinary course after the Effective Date of Confirmation.  Post-Effective Date sales shall be at or greater than 95% of the minimum lot sale price list agreed upon by the Debtor and SABAL, as may be amended by agreement of the parties over the term of the Plan.  With the exception of SABAL's lien,[3] all post-confirmation sales will be deemed sales free and clear of all mortgages, liens, claims, and encumbrances of any nature.  Post-Effective Date sales may be closed in the ordinary course without the need for any further orders of the Court.  Unless otherwise agreed by the Debtor and SABAL, proceeds of real property sales will be used and distributed in accordance with the Feasibility Budget attached to this Plan as **Exhibit A** (the "Feasibility Budget").

The Debtor's Plan contemplates payment in full of all Administrative and Priority claims and the claims of trade creditors.  Additionally, a carveout will be funded in the amount of $650,000, representing a $10,000 distribution to each holder of an Allowed Charter Note Holder Claim.  Under no circumstances will any individual Charter Note Holder receive more

---

[2]    The three (3) year term contemplated in the original plan filed in this matter on May 3, 2013 began on January 1, 2013.  However, as contemplated in the **Exhibit A** attached hereto, the updated Feasibility Budget agreed upon between the Debtor and SABAL anticipates a remaining term of October 2013 through December 2015.

[3]    As set forth below regarding the treatment of SABAL's claim, the Debtor and SABAL have agreed that SABAL's liens will survive confirmation and SABAL will execute mortgage releases for post-effective date sales.

than $10,000 under the Plan.  With the exception of the claim of the Town of Bluffton, which obligation will be fulfilled over the course of the Plan, the Allowed Claims of Administrative and Priority Claimants, Trade Creditors, and Charter Note Holders will be paid at the later of the Effective Date or the Allowance of such claim.  Certain remaining development requirements will be fulfilled over the course of the Plan, including the completion of the community roads as required by the Town of Bluffton at an approximate cost of $700,000 as well as the completion of community sidewalks and other infrastructure at an approximate cost of $150,000.  $10,000 will be escrowed from each of the next 85 lot sale closings in order to fund these remaining development costs. The Debtor anticipates installation of remaining sidewalks by the end of of the first quarter of 2014 and the completion of the remaining roadway improvements by the end of 2014.

After the first $2,306,677 in Gross Sales Proceeds, SABAL shall receive a Release Payment in the amount of 81.47% of the Gross Sales Proceeds from each sale of real property, subject to the $10,000 per sale funding of the Infrastructure Escrow Account as set forth above. The Plan contemplates that SABAL will also receive an executed deed in lieu from the Debtor as to all of the Debtor's real property holdings, which deed in lieu will remain in escrow with counsel for SABAL and may only be filed upon an Event of Default (as defined below) which is not cured (if applicable).

The remaining 18.53% of Gross Sale Proceeds shall be used by the Debtor and its Manager, Reed Development, for the payment of costs associated with real property sales and management of the project and, to any extent excess funds are remaining after the payment of such project costs, for the recoupment of Reed Development's fee reductions in this matter.

The Plan further calls for the subordination of the $2,290,835 Hampton Funding second mortgage debt without any cash consideration being paid to Hampton Funding.  In exchange for this subordination by Hampton Funding, as set forth in more detail in Article XIII of the Plan, the Plan contemplates a release of any and all possible claims, rights and causes of action of the Charter Note Holders against Hampton Funding, Reed Development, and John P. Reed.  All rights of equity interest holders to participate in the sale of realty or the proceeds thereof are extinguished by the Plan.  Reed Development shall hereafter be authorized to act on behalf of the Debtor to carry out the terms of this Plan.  The Plan specifically contemplates that the Declarant Rights will be transferred to and controlled by Hampton Funding free and clear of any liens,

claims, and encumbrances at the end of the Plan if the Debtor makes all of the Plan payments set forth in the Feasibility Budget.

## PLAN CLASSIFICATIONS AND TREATMENT

**Class 1.** **Crimson Portfolio, LLC and its authorized agent SABAL Financial Group LP ("SABAL"). Secured, Impaired.**

A.    Classification.  Class 1 consists of all SABAL's claims against the Debtor.  The SABAL loans are secured by a perfected first priority mortgage in the Debtor's real property holdings as well as a pre-petition security interest in the accounts, deposit accounts, commercial tort claims, fixtures, equipment, instruments, inventory, investment property, chattel paper, letter of credit rights, supporting obligations, intangibles, and proceeds (the "Cash Collateral") of the Debtor.  The Debtor obtained authority to use the Cash Collateral and provided SABAL with replacement liens on the Debtor's post-petition Cash Collateral to the same extent and in the same priority as their pre-petition liens.

B.    Allowance.  SABAL, as successor in interest to Synovus Bank, asserts claims against the Debtor aggregating $20,102,695.99 as of the Petition Date.  The Debtor agrees with the amount of SABAL's asserted claim as of the Petition Date, and SABAL's Allowed Claim shall be allowed in the amount of $20,102,695.99 plus post-petition interest at the rates specified in the parties' pre-petition loan documents.  From the Petition Date to September 30, 2013, SABAL received aggregate payments of $1,839,859.77 from the Debtor.

C.    Treatment.    SABAL's pre-petition and post-petition liens shall survive confirmation of the Plan and SABAL's Allowed Claim shall be treated as follows:

1.    General; Consent to Carveout and Other Payments.  SABAL shall be paid an agreed upon percentage ("Release Payment") from the Gross Sales Proceeds, as set forth herein.  From the Debtor's continued operations and sale of its remaining real property over the Plan term, the Debtor projects that SABAL will receive an additional $17,044,976.  Except as expressly set forth herein, the Release Payment shall equal, and SABAL shall receive, 81.47% of the Gross Sales Proceeds from each sale of real property subject to the $10,000 per sale infrastructure escrow from the first 85 sales as set forth in more detail below.  As part of the resolution set forth in this Plan, however, SABAL has agreed the Debtor may use up to $2,306,677 of revenue, which is projected to represent the Gross Sales Proceeds from the first 17 closings scheduled for October and November 2013, as shown on the Feasibility Budget attached hereto as **Exhibit A**, prior to any distribution to SABAL as follows:

a.    a distribution to the Allowed Claims of Charter Note Holders (the "Carveout") in the amount of $650,000 total, which represents $10,000 per charter note, to be distributed to Charter Note Holders with Allowed Claims on a pro rata basis;

12

b.      an amount not exceeding $400,000 for the payment in full of Allowed Administrative and Priority Claims;

c.      an amount not exceeding $37,721 for the payment in full of Allowed Claims of Trade Creditors; and

d.      other amounts as set forth in the Feasibility Budget.

Additionally, $10,000 shall be escrowed from each of the first 85 lot sales in order to fund the remaining road and infrastructure costs of the Debtor's development. SABAL shall retain a security interest in the escrow account (the "Infrastructure Escrow Account") until such time as those funds are used in accordance with the Plan.  The Debtor shall obtain at least three independent estimates in connection with the infrastructure costs and send to SABAL for review and approval prior to contracting for such costs.

After the first $2,306,677 in Gross Sales Proceeds, SABAL shall receive a Release Payment in the amount of 81.47% of the Gross Sales Proceeds from each sale of real property, subject to the $10,000 per sale funding of the Infrastructure Escrow Account as set forth above.

SABAL's post-petition lien shall continue to apply to the $2,306,677 in funds, subject to the Second Order Approving Extended Final Cash Collateral Budget, and SABAL's consent to the use of $2,306,677 in funds as set forth herein is expressly contingent on confirmation of the Plan on or before January 31, 2014.

2.      <u>Post-Confirmation Closings</u>.   The Release Payment, along with reasonable and customary closing costs approved by SABAL, shall be paid at closing.   Notwithstanding anything to the contrary set forth herein or the Confirmation Order, SABAL's lien will only be released upon the filing of an appropriate release or satisfaction as required by South Carolina law.  Closing attorneys shall be instructed to obtain releases from SABAL in exchange for the Release Payment and SABAL shall upon request provide closing attorneys with a release letter containing a statement that SABAL will release its lien at closing upon payment of the Release Payment and a statement as to the specific dollar amount of the Release Payment required under the Plan.

3.      <u>Sales Prices</u>.  SABAL and the Debtor have agreed to a minimum lot sale price list, which the Debtor and SABAL may revise from time to time.  The Debtor may sell its lots in the ordinary course of its business without the consent of SABAL so long as the proposed sale price is at least 95% of the minimum sale price contained on the agreed upon price list.  The Debtor may only close sales for less than 95% of the minimum prices upon the consent of SABAL.

4.      <u>Bank Accounts; Minimum Balance Requirement</u>.  SABAL shall have a

perfected, first priority lien on the Debtor's post-petition bank accounts, including the Infrastructure Escrow Account, pursuant to deposit account control agreements under which SABAL has authority over such accounts upon an event of default. The Debtor and SABAL have agreed to the form of the deposit account control agreement. Further, the Debtor shall have cash on hand, as of the test date, in an amount greater than or equal to the projected cash balance reflected in the Feasibility Budget (which is represented by the row entitled "Total Cash Available after Expenses"). This minimum balance requirement (the "Minimum Balance Requirement") will be tested quarterly during the term of the Plan (March 31st, June 30th, September 30th, and December 31st). Upon the termination of Debtor's Plan, the Debtor shall pay SABAL $400,000.

5.    Post-confirmation Loan Documents.  On or before the Effective Date, the Debtor shall execute a loan modification, note, the Deed in Lieu (as defined below), and any other necessary loan documents (collectively, the "Post-confirmation Loan Documents") which are consistent with the terms of this Plan and in the form agreed upon by the Debtor and SABAL prior to the filing of the Plan. The Post-confirmation Loan Documents contain reasonable and customary reporting requirements. SABAL's pre-petition mortgage and security interest shall remain in full force and effect, except as otherwise specifically set forth in the Plan, and there shall be no merger of the fee interest obtained by it pursuant to the Deed in Lieu with or into its security interest in the real property.

    a.    Covenants.    The Debtor shall be subject to the following covenants (collectively "Covenants" or, where singular, a "Covenant"), which are included in the agreed upon Post-confirmation Loan Documents:

        (1)    Absorption Covenant: The Debtor's sales volume (absorption) progress will be tested semi-annually beginning June 30, 2014. As of the first sales volume (absorption) test date, the Debtor's cumulative closed lots to date must be greater than 80% of the cumulative closings projected for the period of October 1, 2013 to June 30, 2014 in the Feasibility Budget.  For each subsequent sales volume (absorption) test (tested on December 31, 2014 for closings projected for the period between October 1, 2013 to December 31, 2014 and on and June 30, 2015 for closings projected for the period between October 1, 2013 to June 30, 2015), the Debtor's cumulative closed lots to date must be greater than or equal to 100% of the cumulative closings projected through such test date in the Feasibility Budget.

        (2)    Cumulative Payment Covenant: The Debtor's cumulative payments to SABAL will be tested as of December 31, 2014. The Debtor's projected payments to SABAL must be greater than or equal to 90% of the projected cumulative payments to SABAL as shown in the Feasibility Budget.

(3)    <u>Minimum Balance Covenant</u>: The Debtor shall comply with the Minimum Balance Requirement as set forth above.

(4)    <u>Definition of "cumulative"</u>: For purposes of the Covenants, "cumulative" shall refer to the total closed sales or payments (as applicable) measured from October 1, 2013 through the applicable Covenant test date.

b.    <u>Events of Default</u>.  The following shall each be an event of default ("Event of Default") under the Plan and Post-confirmation Loan Documents: (i) failure to make a Release Payment from the closing of a sale; (ii) a violation of any of the Covenants; (iii) a lien is filed against any of the Debtor's real property and not removed within ten (10) days; (iv) the failure to pay the balance of SABAL's claim at the termination of the Plan on December 31, 2015; (v) the Debtor defaults under the terms of the Plan; and (vi) the Debtor otherwise defaults under the terms of the Post-confirmation Loan Documents (which contain standard clauses requiring the Debtor to maintain and preserve the property, to keep it adequately insured, and to pay property taxes).

6.    <u>Deed in Lieu of Foreclosure</u>.  On or before the Effective Date, the Debtor shall execute a Deed in Lieu of Foreclosure (the "Deed in Lieu") as to all of the Debtor's real property holdings in favor of SABAL in a form agreed upon by the Debtor and SABAL prior to the filing of the Plan, which shall be held by SABAL's counsel and not filed unless and until there is an Event of Default and failure to cure (if applicable), as set forth herein.  For payment defaults, SABAL shall mail written notice of the default to the Debtor at its last known mailing address and provide thirty (30) days from the date of such notice within which to cure the default.  If the payment default is not cured within the thirty (30) day period, SABAL may thereafter record the Deed in Lieu.  For non-payment defaults (which includes a violation of the Covenants), the Debtor shall not have a cure period and SABAL is entitled to record the Deed in Lieu after providing at least ten (10) days written notice by mailing written notice of the default to the Debtor at its last known mailing address.  Failure or delay in recording the Deed in Lieu upon an Event of Default shall not constitute a waiver of SABAL's rights to record the Deed in Lieu.  The Deed in Lieu is not an exclusive remedy; SABAL expressly reserves all other rights and remedies under its mortgage and the Post-confirmation Loan Documents. Upon recording, the Deed in Lieu executed in connection with the Plan shall transfer the subject property free and clear of all liens and encumbrances as of the date of confirmation (other than SABAL's mortgage), including without limitation Hampton Funding's mortgage.  A copy of the Deed in Lieu is being reviewed by a title insurer and will be separately filed with the Court prior to the confirmation hearing in this matter.

Solely for purposes of this Paragraph, the Debtor's failure to remove a lien within ten (10) days shall not constitute an Event of Default entitling SABAL to record

the Deed in Lieu.

7.    <u>Conveyance of Remaining Property at Plan Termination</u>.    Unless otherwise agreed by SABAL, any remaining unsold properties at the end of the Plan term will be transferred free and clear of mortgages, liens, claims and encumbrances in fee simple to SABAL.  If SABAL so elects, the Debtor will retain the unsold properties at the end of the Plan term and continue to market and sell properties with distributions from sales to continue as contemplated in the final year of the Plan.

**Class 2.**    **Town of Bluffton, South Carolina (the "Town") / NBSC, a Synovus Bank ("Synovus").**    **Secured, Unimpaired.**    As part of the Hampton Lake Subdivision project, the Town required that certain roads and infrastructures be put in place and required letters of credit to secure the amounts necessary to have these infrastructures put in place.  At the beginning of the project, Synovus, the Debtor's construction lender, issued letters of credit in the approximate original amount of $12.7 Million.  As portions of the project and infrastructures were completed, the Town released letters of credit.

As of the Petition Date, approximately $404,000 remains in Synovus letters of credit securing the Debtor's infrastructure requirements to the Town. The cost to complete the remaining roads and related infrastructure is now approximately $700,000.  Certain remaining development requirements will be fulfilled over the course of the Plan, including the completion of the community roads as required by the Town at an approximate cost of $700,000 as well as the completion of community sidewalks and other infrastructure at an approximate cost of $150,000.  $10,000 will be escrowed from each of the first 85 lot sales beginning on October 1, 2013 in order to fund these remaining development costs.

In order to maintain the overall value of the Debtor's property and to fulfill its requirements to the Town, the Debtor's Feasibility Budget and Plan contemplate the Debtor's completion of the remaining roadway improvements by the end of 2014.

During the pendency of the Plan, the letters of credit <u>shall</u> <u>not</u> be drawn against as long as the Debtor continues toward completion of the necessary infrastructure as contemplated herein and the Feasibility Budget.  After completion of the required infrastructure, the letters of credit will be cancelled.

**Class 3.**    **Post-petition Management Fees of Reed Development, Inc. ("Reed Development").**    **Administrative Priority, Unimpaired.**  Reed Development is the Debtor's

Manager, which oversees the Debtor's day-to-day operations, including infrastructure, human resources, payroll, bookkeeping, accounting and check writing duties for the Debtor.   Reed Development was designated as the Debtor's Manager in the Operating Agreement of Hampton Lake, LLC and has been maintained as the Manager since the inception of the project. Reed Development receives a monthly management fee for its management services, and the Debtor was current on its monthly management fees to Reed Development at the Petition Date.

Post-petition, the Debtor filed an application for authority to employ Reed Development as an ordinary course professional.   Over the course of the Debtor's bankruptcy proceedings, Reed Development has agreed to reduce its monthly management fees to $30,000 per month in 2013, $27,771 per month in 2014 and $19,438 per month in 2015.    Additionally, Reed Development has agreed to be paid 50% of its monthly fee each month, with the remaining 50% paid to Reed Development at the end of each quarter but only to the extent the Debtor has available cash above $400,000.

The Debtor shall receive 18.53% of Gross Sales Proceeds over the course of the Plan which remain after the Release Payment to Sabal.    These proceeds shall be used by Reed Development for the payment of costs associated with real property sales and management of the project.  To any extent there are funds in excess of $400,000 after the payment of all accrued and outstanding expenses as of such date on each of December 31, 2014 and at December 31, 2015, such excess funds will be paid to Reed Development for the recoupment of its agreed fee reductions in this matter.

The Plan contemplates payment in full of all ordinary post-petition management fees to Reed Development plus ordinary expense reimbursements in accordance with the Feasibility Budget attached as **Exhibit A**.

**Class 4.**         **Administrative Claims of the U.S. Trustee and Estate Professionals. Administrative Priority, Unimpaired.**   This class consists of quarterly fees of the United States Trustee and any unpaid administrative claims of professionals.   United States Trustee fees for the Debtor will be paid by the Debtor in full upon their due date and any amounts remaining due for quarterly fees must be paid prior to the closing of the case.

The Debtor currently estimates that the unpaid and additional post-petition professional fees in this matter will be in the aggregate approximate amount of $414,000.   Post-petition professional fees incurred through the date of confirmation will only be paid upon Court

approval.    Unless otherwise ordered by the Court, post-petition professional fees incurred through the date of confirmation will be paid in full.  Post-confirmation, professional fees, if any, will be paid monthly in the ordinary course.

**Class 5.**        **Other Post-petition Operating Costs.**        **Administrative Priority, Unimpaired.**   This class consists of the Debtor's other post-petition operating expenses as shown in the Feasibility Budget.

Post-petition operating expenses shall be paid in full from the 18.53% of Gross Sales Proceeds remaining from each closing after the Release Payment to SABAL.  Such operating expenses shall be paid in full in the ordinary course of business.  Post-petition ordinary course expenses include, but are not limited to, the costs of closing attorneys, recording fees, real estate commissions (specifically including, but not limited to, commissions owed to insider Hampton Lake Realty, LLC), and other ordinary closing costs associated with the Debtor's sale of properties.  Though the Debtor does not anticipate there being any, this class includes any unpaid contract assumption cure amounts.  If any contract assumption cure amounts are determined to exist, such Allowed Claim will be paid in full upon the Effective Date.

All of the Debtor's post-petition operating expenses will be paid in full in the ordinary course of business.

**Class 6.**        **Internal Revenue Service ("IRS").**  **Priority, Unimpaired.** Except with regard to the approximately $1,625 in federal payroll taxes the Debtor paid pursuant to its first day wage motion in this matter, the Debtor believes and asserts that it is current with any and all income and payroll taxes with the IRS.  The IRS filed a proof of claim asserting estimated tax claims in the amount of $10,649.67.  The Debtor believes and asserts that there are no amounts due to the IRS and that all returns have been timely filed with the IRS.  The Debtor expects to work these issues out with the IRS consensually, but the Debtor intends to object to the IRS proof of claim if it is unable to amicably resolve it.   To any extent it is determined that the Debtor owes any Allowed Claim to the IRS, then such Allowed Claim will be paid in full upon the Effective Date of the Plan or such later date as the taxes are due. Post-petition, any and all IRS taxes shall be kept current and paid in full from the Debtor's operating account.

**Class 7.**        **South Carolina Department of Revenue ("SCDOR").**    **Priority, Unimpaired.**   Except with regard to the approximately $325 in state payroll taxes the Debtor received authority to pay by way of its first day accrued wage motion in this matter, the Debtor

believes and asserts that it was current at the Petition Date on any and all excise, unemployment, income, and payroll taxes owed to SCDOR. However, to any extent it is determined that the Debtor owes pre-petition taxes to SCDOR, then such taxes will be paid in full upon the Effective Date of the Plan or such later date as they come due. Post-petition, any and all taxes owed to SCDOR shall be kept current and paid in full from the Debtor's operating account.

**Class 8.** **Beaufort County, South Carolina ("Beaufort County").** **Priority, Unimpaired.** The Debtor believes and asserts that all ad valorem property taxes that became due to Beaufort County pre-petition were paid prior to the Petition Date. To the extent it is determined that any pre-petition ad valorem taxes went unpaid, such property taxes will be paid in full upon the earlier of the sale of any specific lot on which taxes are owed or 90 days after the Effective Date of the Plan. Upon entry of an Order Confirming Plan, the Debtor will continue to pay ad valorem taxes that become due post-petition as they become due in the ordinary course.

**Class 9.** **Hampton Lake, LLC Employees ("Employees").** **Priority, Unimpaired.** The Debtor has seven (7) full time employees. The Debtor will continue to employ the Employees in the ordinary course of its business without any interruption of work schedule or pay schedule through the term of the Plan. As of the Petition Date, Employees had accrued wages and benefits due in the approximate aggregate amount of $5,500 for time worked prior to the Petition Date. The Debtor received authority to pay such claims pursuant to a first day motion seeking authorization to pay accrued pre-petition wages and employee benefits in full. All post-petition wages, benefits, and insurance premiums will be paid from the Debtor's operating account in the ordinary course of business at the regularly scheduled dates.

Upon confirmation of the Plan, any and all Allowed Claims in this class shall have been paid in full.

**Class 10.** **General Unsecured Trade Vendors ("Trade Creditors").** **Unsecured, Impaired.** This Class is a convenience-type of class that includes the Debtor's Trade Creditors with whom it does business as a part of its normal operations. The Debtor has recently filed an amendment to its schedules listing approximately $37,000 in amounts owed or potentially owed to general unsecured trade vendors.

Any pre-petition Allowed Claims of general unsecured Trade Creditors in this Class will be paid in full, without interest, upon the Effective Date of the Plan.

The post-petition amounts due to general Trade Creditors are not included in this Class.

Post-petition amounts due to trade creditors will be paid in full as administrative priority claims in the ordinary course of the Debtor's business dealings with its trade creditors as set forth in the classes above.

**Class 11.     Charter Note Holders.            Unsecured, Impaired.**     This class consists of the amounts owed by the Debtor for the 65 pre-petition promissory notes of the Charter Note Holders whereby the Charter Note Holders loaned funds to the Debtor under the Debtor's Charter Investor Offering governed by the Confidential Offering Memorandum dated September 16, 2005.   The Charter Investors hold aggregate unsecured, non-priority claims of approximately $26,281,859.50 against the Debtor as of the Petition Date.

In full satisfaction and discharge of the Allowed Claims of the Charter Note Holders, the Debtor's will pay a Carveout on the Effective Date of the Plan to the creditors in this class in the amount of $650,000 total, to be distributed to Charter Note Holders with Allowed Claims on a pro rata basis.   The $650,000 carveout represents an up-front payment of $10,000 toward each of the 65 charter notes.  Under no circumstances will any individual Charter Note Holder receive more than $10,000 under the Plan. This class shall not accrue any post-petition interest nor will any other payments be made with respect to such claims.  "The Official Committee of Unsecured Creditors (the "Committee") has agreed to support the treatment of unsecured creditors under this Plan.  The Committee's support of this Plan is contingent upon the $650,000 carveout payment being made within the first two weeks of January 2014."

In order to allow for payment to the Charter Note Holders, Hampton Funding has agreed to forego any monetary payment under this Plan and subordinate its $2,290,835 second priority mortgage to the claims of the Charter Note Holders. **As set forth in more detail in Article XIII below, this Plan contemplates a release by the Charter Note Holders of any and all possible claims, rights and causes of action against Hampton Funding, Reed Development, and John P. Reed in return for Hampton Funding's consensual subordination of its substantial secured claims against the Debtor, which subordination has allowed for the monetary recovery by the Charter Note Holders.**

**Class 12.        Hampton Lake Funding, LLC ("Hampton Funding").       Secured, Impaired.**     Hampton Funding, an affiliate and insider of the Debtor, alleges a second priority secured mortgage on the Debtor's real property in the approximate amount of $2,290,835.  Upon entry of an Order Confirming Plan, this claim shall be subordinated to all other creditor claims

herein, specifically including, but not limited to, the claims of the Charter Note Holders in Class 11 above.  The Plan contemplates no payments of any cash consideration to Hampton Funding.  However, as set forth in more detail in Article XIII of the Plan, in exchange for this consensual subordination by Hampton Funding, the Plan specifically calls for a release of any and all possible claims, rights and causes of action of the Charter Note Holders against Hampton Funding, Reed Development, and John P. Reed.  Additionally, the Plan contemplates the transfer of the Declarant Rights for the Hampton Lake Subdivision to Hampton Funding the end of the Plan if the Debtor makes all of the Plan payments set forth in the Feasibility Budget.

**Class 13.**    **Hampton Lake, LLC Equity Holders ("Equity Interests").**    **Equity Holder, Impaired.**  This Class consists of the Equity Interests in the Debtor.  Though Reed Development is the manager of the Debtor, the Equity Interests in the Debtor are held: 25% by Dominion Holdings Inc., 25% by John P. Reed, 25% by RFM Investments I LLC, and 25% by William Stewart.  The Equity Interests in the Debtor and any rights of Equity Interest holders to participate in the sale of realty or the proceeds thereof are extinguished by the Plan.  Reed Development shall hereafter be authorized to act on behalf of the Debtor to carry out the terms of this Plan.  As set forth in more detail in Article XIII of the Plan, the Plan contemplates a release of any and all possible claims, rights and causes of action of the Charter Note Holders against Equity Interest holder John P. Reed.


## ARTICLE IV

### Feasibility of Proposed Plan of Liquidation and Means of Effectuation

The Debtor believes and asserts that it has the ability to make the payments set forth herein and in the Disclosure Statement.  The Debtor has prepared and attached hereto as **Exhibit A** an updated Feasibility Budget demonstrating the feasibility of the Plan. 11 U.S.C. §1129(a)(11) provides that in order for a plan to be confirmed, it must be demonstrated that the plan is not likely to be followed by liquidation or the need for further reorganization of the debtor.  The Debtor's Plan calls for the orderly liquidation of the Debtor's assets.  Based on the projections contained in the Feasibility Budget, the Debtor has the ability to make the payments and distributions called for under the Plan. Therefore, the Debtor asserts that the Plan is not likely to be followed by liquidation or the need for further reorganization of the Debtor.

## ARTICLE V

### Conditions Precedent and Implementation of the Plan

**A.    Conditions precedent to Confirmation**

Prior to Confirmation, the Bankruptcy Court shall have signed, and the Clerk of the Bankruptcy Court shall have entered an order granting approval of the Disclosure Statement and find that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code, and such order shall have become a Final Order. The Order Confirming Plan (a/k/a the "Confirmation Order") shall have been signed by the Bankruptcy Court and entered by the Clerk of the Bankruptcy Court.

**B.    Implementation on the Effective Date**

This Plan shall become effective and operative upon the Effective Date of Confirmation. The Effective Date of Confirmation is the day that is fifteen (15) days after entry of the Order Confirming Plan unless any Order Confirming Plan shall be appealed, in which case the Effective Date shall be the day immediately after the Order Confirming Plan becomes a final, unappealed order.

## ARTICLE VI

### Claims Bar Date, Objections to Claims, and
### Status of Claims Post-Confirmation

**A.    Allowance of Claims**

Except as expressly provided herein or any order entered in this Chapter 11 Case prior to the Effective Date (including the Order Confirming Plan), no Claim shall be deemed Allowed, unless and until such Claim is deemed Allowed under the Bankruptcy Code, is agreed to be Allowed by the Debtor, or is ordered Allowed by Final Order of the Bankruptcy Court. Except as expressly provided in this Plan, the Debtor after Confirmation, will have and retain any and all rights and defenses the pre-petition and pre-confirmation Debtor had with respect to any Claims, including, but not limited to, any causes of actions or defenses related thereto. The Debtor also retains the right to file any necessary claims objections or necessary motions and pleadings for estimation or determination of the amount of any disputed Claim. All Claims of any person or entity that owes money to the Debtor shall be disallowed unless and until such Person or Entity

22

pays the full amount it owes the Debtor.

**B.    Claims Bar Date**

Unless otherwise ordered by the Court, the Claims Bar Date shall be <u>September 13, 2013</u> <u>for all creditors except governmental units</u> and shall be <u>October 29, 2013 for a governmental unit</u> as such dates were set forth in the Court's Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, & Deadlines issued on the Petition Date in this Case.  Unless specifically ordered otherwise by the Court, only Claims scheduled by the Debtor without any contingent, unliquidated, or disputed notations, and those Claims filed by proof of claims on or before the Claims Bar Date, shall constitute Claims asserted against the Debtor in this Case.  Any Claims filed after the Claims Bar Date shall be automatically disallowed unless the claimant successfully obtains an order of the Court or consent of the Debtor allowing a late-filed proof of claim.

**C.    Authority to Prosecute Objections**

The Debtor specifically reserves the right to object to any Claim the Debtor disputes, whether such Claim resulted from the Debtor's schedules or from a filed proof of claim.  After the Effective Date, only the Debtor and bankruptcy counsel shall have the authority to file objections to Claims and to settle, compromise, withdraw, or litigate to judgment objections to Claims.

From an initial review of the Court's Claims Register in this matter at the date of this Plan, it appears that the majority of claims filed against the Debtor's estate are the asserted claims of Charter Note Holders.  Though the amounts of these filed claims vary, the Debtor has obtained an order estimating 63 of the 65 charter note claims at $404,336.30 each.  To any extent that Joshua Tillman or Jon Morris, the other two Charter Note Holders, have asserted claims in excess of $404,336.30, the Debtor anticipates a claim objection as to such additional amounts. The Debtor further anticipates an objection to the proof of claim filed by the Internal Revenue Service in this matter for estimated taxes, which taxes the Debtor does not believe are owed. Also, the Debtor anticipates objecting to claims that have been paid post-petition or that will be paid over the course of the Debtor's Plan, including the filed claims of Victor and Maria Alfieri and the copier lease claim of Ikon Financial Services.

**D.    Claims Objection Bar Date**

Except as otherwise ordered by the Court, any and all objections to Claims shall be Filed with the Court and served upon the relevant Creditors by the date that is 180 days after the Effective Date or 180 days after such Claim or any amendment thereto is Filed, whichever date

is later (the "Claims Objection Bar Date"). The Bankruptcy Court upon motion of the Debtor may extend this Claims Objection Bar Date. Any distributions called for in the Plan with respect to and on account of Claims to which objections have been filed, will be made as soon as practicable only after such Claim becomes an Allowed Claim.

E.      **Status of Claims After Confirmation**

From and after Confirmation of this Plan, the Debtor is exonerated from any and all pre-petition Claims that were not filed by a creditor or claimant of interest against the Debtor prior to the Claims Bar Date set by this Court or otherwise scheduled by the Debtor without qualification. The Debtor will, from and after Confirmation of this Plan, be indebted for, and obligated to pay, only those liabilities and obligations set forth in Article III of this Plan, and only those that are Allowed Claims.


**ARTICLE VII**

**Executory Contracts**

The Debtor intends to continue its normal operations in the ordinary course post-petition. Therefore, the Debtor shall assume all of the Executory Contracts, which Executory Contracts are shown in Schedule G of the Bankruptcy Schedules for the Debtor. Schedule G is also attached to the Disclosure Statement as **Exhibit E**, and there are not believed to be any cure amounts due as evidenced by the Debtor's Schedule F filed with the Court. Any and all cure amounts owed for Allowed Claims for the assumption of Executory Contracts will be treated as Administrative Claims and will be paid in full as set forth in Class 5 hereinabove.


**ARTICLE VIII**

**Tax Consequences**

The tax implications of the Debtor's Plan are discussed in the Debtor's Disclosure Statement. No federal income taxes appear in the Feasibility Budget attached to this Plan as **Exhibit A** because the Debtor does not anticipate any taxable income during the Plan term. The Tax Consequences section of the Disclosure Statement, including any amendments or addendums thereto, is hereby specifically incorporated in the Plan by reference.

## ARTICLE IX

### Jurisdiction

1.  <u>Retention of Jurisdiction</u>.    The Court shall retain jurisdiction over the Debtor, its property, and all other parties appearing in this Case as provided by this Plan or by further Order of the Court. The Court shall retain jurisdiction as provided in the Bankruptcy Code until entry of the final decree closing the bankruptcy Case and as set forth thereafter in the final decree.    To the extent that may be necessary, Debtor may request that the Court enter a final order closing the Case but retaining jurisdiction for a limited purpose, including, but not limited to, presiding over any adversary proceedings or claim objections that may be pending at the time of the closing of the bankruptcy Case.

2.  <u>Prosecution and Defense of Claims</u>.    The Debtor shall retain full power after Substantial Consummation to prosecute and defend any causes of action or proceedings existing at Substantial Consummation by or against it, or resulting from the administration of the estate of the Debtor or resulting from any other claim by or against the Debtor or its assets, or arising prior to or existing before Substantial Consummation.  Such reservations specifically include, but are not limited to, prosecution/assertion of the Chapter 5 Causes of Action and claims objections.

## ARTICLE X

### Post-Confirmation Acts

1.      The Debtor, and its agents, shall perform all acts necessary to complete and consummate this Plan, to include:

a.  Prosecution of all claims and causes of action against third parties by the Debtor and claims objections filed by the Debtor against third parties;

b.  Execution and filing of all legal documents required; and

c.  Performing any and all functions required by the Code.

2.      In addition to the continuing monthly reporting requirements that will continue until a final decree is entered in the Case, the Debtor shall cause to be filed with the Court a final report containing an itemized list of all disbursements by the Debtor after the Petition Date in this Case.

## ARTICLE XI

### "Cram Down" for Impaired Creditors

### Not Accepting the Plan

With respect to any class of creditors impaired but not accepting the Plan by the requisite majority in number and two-thirds in amount, the proponent of this Plan requests that the Court find that the Plan does not discriminate unfairly and is fair and equitable with respect to each class of Claims or Interest that are impaired under the Plan and that the Court confirm the Plan without such acceptances by the rejecting Impaired classes.

## ARTICLE XII

### Discharge of the Debtor

Under the Plan, the effects of Confirmation shall be as provided under Bankruptcy Code sections 1141(a), (b), (c), and (d)(3). The Debtor and the estate shall continue to exist following Confirmation and until Final Consummation. Pursuant to section 1141(d)(3) of the Bankruptcy Code, the Debtor shall not be discharged by Confirmation or under the Plan.

## ARTICLE XIII

### Third Party Releases

**Release by Charter Note Holders of Claims Against Hampton Lake Funding, LLC ("Hampton Funding"), and its affiliates Reed Development, Inc. ("Reed Development") and John P. Reed ("Reed")**: As of the Effective Date of the Plan, any and all Claims, rights or causes of action of any nature whatsoever, whether previously or currently held or that may be held in the future, by ANY AND ALL CHARTER NOTE HOLDERS against HAMPTON FUNDING, REED DEVELOPMENT, AND REED arising out of, or in any way related to the Debtor or its operations, shall be deemed to be PERMANENTLY RELEASED. This RELEASE is applicable only to any and all actions by the Charter Note Holders relating to the Debtor's operations, specifically including, but not limited to, actions relating to the Charter Investor Offering and Confidential Offering Memorandum dated September 16, 2005. The release is based upon the mutual consideration provided by Hampton Funding's subordination of its

secured claim against the Debtor's estate in Class 12 in order for Charter Note Holders to receive a distribution on their Allowed Claims.

RESPECTFULLY SUBMITTED on this the 2nd day of December 2013, at Columbia, South Carolina.

MCCARTHY LAW FIRM, LLC

By:    /s/Daniel J. Reynolds, Jr.
            G. William McCarthy, Jr., I.D.#2762
            Daniel J. Reynolds, Jr., I.D.#9232
            Sean P. Markham, I.D..#10145
            W. Harrison Penn, I.D.#11164
            *Attorneys for the Debtor*
            1517 Laurel Street
            P.O. Box 11332
            Columbia, SC 29201-1332
            (803) 771-8836
            (803) 765-6960 (fax)
            dreynolds@mccarthy-lawfirm.com

**EXHIBIT A**

Hampton Lake - Revised Feasibility Plan
DISCUSSION DRAFT

| | | 2013 | | | 2014 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | October | November | December | January | February | March | April | May | June | July | August | September | October | November | December |
| **Revenue** | | | | | | | | | | | | | | | | |
| Closings | | 9 | 10 | 3 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 8 | 8 | 6 | 9 | 9 |
| Revenue from Closings | | $1,034,144 | $1,272,534 | $200,748 | $612,396 | $612,396 | $612,396 | $612,396 | $612,396 | $612,396 | $816,528 | $816,528 | $612,396 | $918,594 | $918,594 |
| Commercial Property | | | | | | | | | | | | | | | | $750,000 |
| Misc & Interest Income | | $200 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 |
| **Total Revenue** | | $1,034,344 | $1,279,534 | $207,748 | $619,396 | $619,396 | $619,396 | $619,396 | $619,396 | $619,396 | $823,528 | $823,528 | $619,396 | $925,594 | $1,675,594 |
| Road Top Coat and Sidewalk Escrow | ($850,000) | $0 | ($190,000) | ($30,000) | ($60,000) | ($60,000) | ($60,000) | ($60,000) | ($60,000) | ($60,000) | ($80,000) | ($80,000) | ($50,000) | $0 | $0 |
| **Cash Available after Escrowed Funds** | | $1,034,344 | $1,089,534 | $177,748 | $559,396 | $559,396 | $559,396 | $559,396 | $559,396 | $559,396 | $743,528 | $743,528 | $569,396 | $925,594 | $1,675,594 |
| **Sabal Distributions** | | | | | | | | | | | | | | | | |
| Distribution from Closings (% gross rev after first $2.2MM) | 81.47% | | | $144,819 | $455,764 | $455,764 | $455,764 | $455,764 | $455,764 | $455,764 | $605,784 | $605,784 | $463,912 | $754,122 | $1,365,179 |
| Excess from Cash Account | | | | | | | | | | | | | | | | |
| **Total Sabal Distributions** | | $0 | $0 | $144,819 | $455,764 | $455,764 | $455,764 | $455,764 | $455,764 | $455,764 | $605,784 | $605,784 | $463,912 | $754,122 | $1,365,179 |
| **Cash Available for Operations** | | | | | | | | | | | | | | | | |
| Cash on Hand | | $879,918 | $1,665,175 | $2,363,847 | $1,531,944 | $754,198 | $662,413 | $544,225 | $494,666 | $457,948 | $371,901 | $340,657 | $284,651 | $205,516 | $193,481 | $163,393 |
| Cash Available from Revenue Less Sabal Distributions | | $1,034,344 | $1,089,534 | $32,929 | $103,632 | $103,632 | $103,632 | $103,632 | $103,632 | $103,632 | $137,744 | $137,744 | $105,484 | $171,472 | $310,415 |
| **Total Cash Available for All Expenses** | | $1,914,262 | $2,754,709 | $2,396,776 | $1,635,576 | $857,830 | $766,045 | $647,856 | $598,298 | $561,580 | $475,532 | $478,401 | $422,394 | $311,001 | $364,953 | $473,808 |
| **Unsecured Creditor Payments** | | | | | | | | | | | | | | | | |
| Charter Note Holders | ($650,000) | | | | ($650,000) | | | | | | | | | | | |
| Other Creditors | ($37,721) | | | ($37,721) | | | | | | | | | | | | |
| **Bankruptcy Atty Fees** | | | | | | | | | | | | | | | | |
| Attorney Fees | ($414,000) | | | ($414,000) | | | | | | | | | | | | |
| **Closing Costs** | | | | | | | | | | | | | | | | |
| Commissions | 7.30% | ($56,652) | ($92,895) | ($14,655) | ($44,705) | ($44,705) | ($44,705) | ($44,705) | ($44,705) | ($44,705) | ($59,607) | ($59,607) | ($44,705) | ($67,057) | ($112,057) |
| Closing Costs | 0.75% | ($9,835) | ($9,544) | ($1,506) | ($4,593) | ($4,593) | ($4,593) | ($4,593) | ($4,593) | ($4,593) | ($6,124) | ($6,124) | ($4,593) | ($6,889) | ($6,889) |
| Incentives | | ($22,914) | ($79,553) | ($28,003) | ($11,529) | ($9,882) | ($9,882) | ($9,882) | ($11,529) | ($11,529) | ($13,176) | ($13,176) | ($9,882) | ($14,824) | ($14,824) |
| **POA Costs** | | | | | | | | | | | | | | | | |
| POA Subsidy | | ($63,000) | ($86,667) | ($110,334) | $25,776 | ($20,644) | ($44,724) | ($8,742) | ($19,273) | ($28,679) | ($8,291) | ($7,933) | ($12,201) | $1,440 | ($6,147) | ($32,214) |
| **Operational Expenses** | | | | | | | | | | | | | | | | |
| G & A | | ($19,533) | ($15,000) | ($60,000) | ($14,600) | ($14,600) | ($58,300) | ($14,600) | ($14,600) | ($58,300) | ($14,600) | ($14,600) | ($58,300) | ($14,600) | ($58,300) |
| Marketing | | ($33,498) | ($39,365) | ($45,232) | ($57,197) | ($49,866) | ($40,150) | ($37,771) | ($35,847) | ($29,894) | ($29,905) | ($38,435) | ($32,612) | ($38,901) | ($29,802) | ($29,623) |
| Sales Operations | | ($31,643) | ($49,546) | ($67,449) | ($30,291) | ($50,468) | ($18,808) | ($7,238) | ($10,791) | ($11,321) | ($8,093) | ($40,496) | ($33,981) | ($5,620) | ($36,252) | ($27,675) |
| **Property Insurance & Taxes** | | | | | | | | | | | | | | | | |
| Insurance | | | | ($9,861) | ($12,500) | | | | ($12,500) | | | ($12,500) | | | ($12,500) | |
| Property Taxes | | ($2,262) | ($3,167) | ($4,072) | ($69,238) | ($658) | ($658) | ($658) | ($658) | ($658) | ($658) | ($878) | ($878) | ($658) | ($987) | ($987) |
| **Professional/BK Costs** | | | | | | | | | | | | | | | | |
| Professional Fees | | | | ($72,000) | ($12,501) | | | ($12,501) | | | ($12,501) | | | ($12,501) | |
| Trustee Fees | | ($9,750) | ($15,125) | | | | | | | | | | | | | |
| **Total Expenses** | | ($249,086) | ($390,861) | ($864,832) | ($881,378) | ($195,417) | ($221,820) | ($153,190) | ($140,350) | ($189,679) | ($134,875) | ($193,750) | ($216,878) | ($117,520) | ($201,560) | ($282,570) |
| **Total Cash Available after Expenses** | | $1,665,175 | $2,363,847 | $1,531,944 | $754,198 | $662,413 | $544,225 | $494,666 | $457,948 | $371,901 | $340,657 | $284,651 | $205,516 | $193,481 | $163,393 | $191,238 |

Hampton Lake - Revised Feasibility Plan
DISCUSSION DRAFT

| | January | February | March | April | May | June | July | August | September | October | November | December | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 2015 | | | | | | | |
| **Revenue** | | | | | | | | | | | | | |
| Closings | 8 | 7 | 7 | 8 | 8 | 8 | 9 | 9 | 9 | 10 | 11 | 13 | |
| Revenue from Closings | $810,808 | $709,457 | $709,457 | $810,808 | $810,808 | $810,808 | $912,159 | $912,159 | $912,159 | $1,013,510 | $1,114,861 | $1,317,563 | $21,721,394 |
| Commercial Property | | | | | | | | | | | $750,000 | | $1,500,000 |
| Misc & Interest Income | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $182,200 |
| **Total Revenue** | $817,808 | $716,457 | $716,457 | $817,808 | $817,808 | $817,808 | $919,159 | $919,159 | $919,159 | $1,020,510 | $1,121,861 | $2,074,563 | $23,403,594 |
| Road Top Coat and Sidewalk Escrow | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | ($850,000) |
| **Cash Available after Escrowed Funds** | $817,808 | $716,457 | $716,457 | $817,808 | $817,808 | $817,808 | $919,159 | $919,159 | $919,159 | $1,020,510 | $1,121,861 | $2,074,563 | $22,553,594 |
| **Sabal Distributions** | | | | | | | | | | | | | |
| Distribution from Closings (% gross rev after first $2.2MM) | $666,304 | $583,729 | $583,729 | $666,304 | $666,304 | $666,304 | $748,879 | $748,879 | $748,879 | $831,454 | $914,029 | $1,690,236 | $16,644,976 |
| Excess from Cash Account | | | | | | | | | | | $400,000 | | $400,000 |
| **Total Sabal Distributions** | $666,304 | $583,729 | $583,729 | $666,304 | $666,304 | $666,304 | $748,879 | $748,879 | $748,879 | $831,454 | $914,029 | $2,090,236 | $17,044,976 |
| **Cash Available for Operations** | | | | | | | | | | | | | |
| Cash on Hand | $191,238 | $134,177 | $115,145 | $96,771 | $108,012 | $138,961 | $142,457 | $176,091 | $182,018 | $174,760 | $225,943 | $246,658 | |
| Cash Available from Revenue Less Sabal Distributions | $151,504 | $132,728 | $132,728 | $151,504 | $151,504 | $151,504 | $170,280 | $170,280 | $170,280 | $189,056 | $207,832 | -$15,673 | |
| **Total Cash Available for All Expenses** | $342,743 | $266,906 | $247,874 | $248,275 | $259,516 | $290,465 | $312,737 | $346,372 | $352,298 | $363,816 | $433,775 | $230,985 | |
| **Unsecured Creditor Payments** | | | | | | | | | | | | | |
| Charter Note Holders | | | | | | | | | | | | | ($650,000) |
| Other Creditors | | | | | | | | | | | | | ($37,721) |
| **Bankruptcy Atty Fees** | | | | | | | | | | | | | |
| Attorney Fees | | | | | | | | | | | | | ($414,000) |
| **Closing Costs** | | | | | | | | | | | | | |
| Commissions | ($59,189) | ($51,790) | ($51,790) | ($59,189) | ($59,189) | ($59,189) | ($66,588) | ($66,588) | ($66,588) | ($73,986) | ($81,385) | ($127,182) | ($1,642,821) |
| Closing Costs | ($6,081) | ($5,321) | ($5,321) | ($6,081) | ($6,081) | ($6,081) | ($6,841) | ($6,841) | ($6,841) | ($7,601) | ($8,361) | ($9,882) | ($164,989) |
| Incentives | ($11,963) | ($10,467) | ($10,467) | ($11,963) | ($11,963) | ($11,963) | ($13,458) | ($13,458) | ($13,458) | ($14,953) | ($16,449) | ($19,439) | ($430,469) |
| **POA Costs** | | | | | | | | | | | | | |
| POA Subsidy | | | | | | | | | | | | | ($421,633) |
| **Operational Expenses** | | | | | | | | | | | | | |
| G & A | ($10,500) | ($10,500) | ($41,500) | ($10,500) | ($10,500) | ($41,500) | ($10,500) | ($10,500) | ($41,500) | ($10,500) | ($10,500) | ($32,166) | ($685,199) |
| Marketing | ($38,131) | ($33,244) | ($26,766) | ($25,180) | ($23,898) | ($19,929) | ($19,937) | ($25,623) | ($21,741) | ($25,934) | ($19,868) | ($19,749) | ($868,098) |
| Sales Operations | ($24,090) | ($40,138) | ($14,958) | ($5,756) | ($8,582) | ($9,003) | ($6,437) | ($32,207) | ($27,025) | ($4,470) | ($28,832) | ($22,010) | ($653,181) |
| **Property Insurance & Taxes** | | | | | | | | | | | | | |
| Insurance | ($12,500) | | | | ($12,500) | | | ($12,500) | | | ($12,500) | | ($109,861) |
| Property Taxes | ($37,360) | ($300) | ($300) | ($343) | $343 | ($343) | ($386) | ($386) | ($386) | ($429) | ($471) | ($557) | ($128,680) |
| **Professional/BK Costs** | | | | | | | | | | | | | |
| Professional Fees | ($8,751) | | | ($8,751) | | | | ($8,751) | | | ($8,751) | | ($157,008) |
| Trustee Fees | | | | | | | | | | | | | ($24,875) |
| **Total Expenses** | ($208,565) | ($151,760) | ($151,103) | ($140,263) | ($120,556) | ($148,006) | ($136,646) | ($164,354) | ($177,539) | ($137,873) | ($187,117) | ($230,985) | ($6,388,537) |
| **Total Cash Available after Expenses** | $134,177 | $115,145 | $96,771 | $108,012 | $138,961 | $142,457 | $176,091 | $182,018 | $174,760 | $225,943 | $246,658 | $0 | |

**EXHIBIT B**

Upon recording please return to:

# DECLARATION OF EASEMENTS AND COVENANT TO SHARE COSTS FOR HAMPTON LAKE

TABLE OF CONTENTS

PAGE

BACKGROUND STATEMENT................................................................1

DECLARATION OF INTENT AND BINDING EFFECT..............................2

Article I Shared Areas; Easements ...........................................2

   1.1.   Shared Areas. ......................................................2
   1.2.   Easements...........................................................4

Article II Obligation to Maintain, Operate and Insure Shared Areas .........6

   2.1.   Maintenance and Operation; Community-Wide Standard. .......6
   2.2.   Obligation to Insure. ...........................................6
   2.3.   Dispute Procedures. ...........................................7
   2.4.   Limitation of Liability. ........................................7

Article III Obligation to Share Costs .......................................8

   3.1.   Allocation of Shared Expenses. ..............................8
   3.2.   Payment of Assessments. .....................................9
   3.3.   Recordkeeping....................................................9

Article IV General...........................................................10

   4.1.   Notice..............................................................10
   4.2.   Successors and Assigns. .....................................10
   4.3.   Enforcement......................................................11
   4.4.   Amendment. .......................................................11
   4.5.   Duration............................................................11
   4.6.   Interpretation....................................................12
   4.7.   Waiver..............................................................12
   4.8.   Severability. ....................................................12
   4.9.   Captions...........................................................12

# DECLARATION OF EASEMENTS AND COVENANT TO SHARE COSTS
## FOR
## HAMPTON LAKE

THIS DECLARATION OF EASEMENTS AND COVENANT TO SHARE COSTS FOR HAMPTON LAKE ("**Covenant to Share Costs**") is made as of the date set forth on the signature page by Hampton Lake, LLC, a South Carolina limited liability company (together with its successors and assigns, the "**Phase 1 Declarant**"); Hampton Lake Community Association, Inc., a South Carolina nonprofit corporation ("**Phase 1 Association**"); and JPR Properties, Inc., a South Carolina corporation (together with its successors and assigns, the "**Phase 2 Declarant**").

## BACKGROUND STATEMENT

Hampton Lake is a planned community located in Bluffton, Beaufort County, South Carolina, being developed in phases ("**Hampton Lake**" or the "**Community**"). A portion of the property to be developed as Hampton Lake has been made subject to that Community Charter for the Hampton Lake Community, executed by the Developer as "Declarant," and recorded on March 31, 2006, as File No. 2006025898, in OR Book 2347, Page 1593, *et seq.*, in the Office of the Register of Deeds for Beaufort County, South Carolina (as amended and supplemented from time to time, the "**Phase 1 Charter**"). The real property now and hereafter made subject to the Phase 1 Charter is referred to herein as the "**Phase 1 Property**." Phase 2 of Hampton Lake is planned to include all or a portion of the real property described on Exhibit A attached hereto, which property is currently owned by the Phase 2 Declarant. The Phase 1 Charter contemplates, but does not require, the expansion of Hampton Lake to include all or a portion of the Phase 2 Property; however, in the discretion of the Phase 2 Declarant subject to any approval or other rights of the mortgagee and/or lender of the Phase 2 Property, all or portions of the property described in Exhibit A may be made subject to a separate instrument hereafter recorded in the Office of the Register of Deeds for Beaufort County, South Carolina, setting forth similar covenants, restrictions and easements and providing for mandatory membership in a community association for all owners of residential lots or units subject to such instrument (as such document may be amended and supplemented from time to time, the "**Phase 2 Charter**"). Such portions of the property described in Exhibit A as are hereafter made subject to the Phase 2 Charter are referred to herein as the "**Phase 2 Property**."

The Phase 1 Declarant is the "Declarant" under the Phase 1 Charter. The Phase 1 Association is a mandatory membership owners association formed and existing to administer the Phase 1 Charter and to maintain, operate, and insure various properties for common use, including those described in Exhibit B attached hereto, which are currently owned by the Phase 1 Declarant or the Phase 1 Association. Each "Unit" as described in the Phase 1 Charter is referred to herein as a "**Phase 1 Unit**" and each "Owner," as defined in the Phase 1 Charter, is referred to herein as a "**Phase 1 Unit Owner**." Under the Phase 1 Charter, each Phase 1 Unit Owner is a member of the Phase 1 Association and obligated to pay assessments to the Phase 1 Association on account of each Phase 1 Unit it owns, which obligation is secured by a lien in favor of the Phase 1 Association against such Phase 1 Unit.

Upon recording of a Phase 2 Charter, the Phase 2 Declarant intends to establish a separate mandatory membership owners association (the "**Phase 2 Association**") to administer the Phase 2 Charter and to maintain, operate, and insure various properties described in the Phase 2 Charter. Each residential lot or unit hereafter made subject to the Phase 2 Charter is referred to herein as a "**Phase 2 Unit**" and the record owner of each Phase 2 Unit is referred to herein as a "**Phase 2 Unit Owner**." The Phase 2 Charter

shall provide that each Phase 2 Unit Owner shall be a member of the Phase 2 Association and shall be obligated to pay assessments to the Phase 2 Association on account of each Phase 2 Unit it owns, which obligation shall be secured by a lien in favor of the Phase 2 Association against such Phase 2 Unit.

The Phase 1 Association and Phase 2 Association are referred to herein collectively as the "**Associations**" and singularly as an "**Association.**"   The Phase 1 Unit Owners and the Phase 2 Unit Owners are referred to herein collectively as "**Unit Owners**" and singularly as a "**Unit Owner.**"   The Phase 1 Units and the Phase 2 Units are referred to herein collectively as "**Units**" and singularly as a "**Unit.**"

In anticipation of the recording of the Phase 2 Charter and the creation of the Phase 2 Association, the Phase 1 Declarant, the Phase 1 Association, and the Phase 2 Declarant desire to provide for (i) mutual and reciprocal easements for access, use and enjoyment over certain portions of the Phase 1 Property described herein as "Phase 1 Shared Areas" and over certain portions of the Phase 2 Property described herein as "Phase 2 Shared Areas" (collectively, the "**Shared Areas**"); (ii) maintenance and operation of such Shared Areas for the mutual benefit of the Associations and the Unit Owners; and (iii) an equitable allocation of certain costs incurred by the Phase 1 Association and the Phase 2 Association in performing their responsibilities hereunder.

### DECLARATION OF INTENT AND BINDING EFFECT

NOW, THEREFORE, the Phase 1 Declarant, as the owner of the Phase 1 Shared Areas and the Phase 2 Declarant, as the owner of the property described in Exhibit A, with the joinder and consent of the Phase 1 Association, and the mortgagee whose consent and subordination is attached hereto, hereby declare that the Phase 1 Shared Areas and the Phase 2 Property, respectively, shall be held, sold, and conveyed subject to the covenants and conditions contained herein, which are made for the express benefit of the Phase 1 Declarant, the Phase 1 Association and its members, the Phase 2 Declarant, and the Phase 2 Association (if and when created) and its members.   The covenants and conditions contained herein shall run with the title to the Phase 1 Shared Areas and the property described on Exhibit A and shall be binding upon the Phase 1 Association and the Phase 2 Association and all persons and entities now or hereafter having any right, title, or interest in the Phase 1 Shared Areas and the Phase 2 Property, and their heirs, successors, successors-in-title, and assigns.

### Article I
### Shared Areas; Easements

**1.1.    Shared Areas.**

(a)    Phase 1 Shared Areas.   The "**Phase 1 Shared Areas**" consist of the following portions of the Phase 1 Property, whether or not owned by the Phase 1 Association:

(i)    all Common Areas, as defined in the Phase 1 Charter, except those portions of the Common Area designated as "Limited Common Area" pursuant to the Phase 1 Charter;

(ii)    all parcels designated as "Common Area" or "Open Space" on recorded plats of any portion of the Phase 1 Property;

(iii)    the Hampton Lake community entry features at the intersection of Bluffton Parkway and Hampton Lake Drive, including associated landscaping, irrigation systems, and lighting, if any;

(iv)    the gate house on Hampton Lake Drive between Bluffton Parkway and Fording Court, and all associated landscaping, irrigation systems, and lighting, if any;

(v)    all rights-of-way and private roadways described on recorded plats of any portion of the Phase 1 Property, including any sidewalks, streetlights, landscaping, and irrigation systems within such rights-of-way and private roadways;

(vi)    community identification, traffic and directional signage within rights-of way or Common Area (as defined in the Phase 1 Charter) within the Phase 1 Property, except directional signage placed by the Phase 1 Declarant or the Phase 2 Declarant or their respective designees in connection with the marketing and sale of Units pursuant to Section 1.2(c);

(vii)    stormwater drainage, detention, and retention facilities and equipment within the Phase 1 Property which serve both the Phase 1 Property and the Phase 2 Property, if any; and

(viii)    those portions of the Phase 1 Property lying within the property depicted on the recorded plats referenced in Exhibit B and commonly known as, or identified on the proposed master plan of Hampton Lake attached as Exhibit C (the "**Master Plan**") as: the Lake, Adventure Lagoon and pool; Lakeside Village or "Lakeside Amenity Village" and all related out-buildings, including Backwater Bill's Grill, the Spa and Fitness Central facilities, and Doc's Boathouse; the Tackle Box retail facility, the Dog Park or "Dog Paddle Park;" The Outpost campsite; the Lakehouse facility, Sandi Point Beach; Mother Nature's Center; Shrimp's Place playground; and all tennis and basketball courts, walking and nature trails within the "Area of Common Responsibility," as defined in the Phase 1 Charter.

Notwithstanding the above, if and when responsibility for maintenance and operation of any of the foregoing amenities comprising the Phase 1 Shared Areas is transferred to the Lake Maintenance Corporation and the Phase 2 Property is afforded easements for use and enjoyment of the same pursuant to that certain Covenant for Joint Use and Maintenance at Hampton Lake recorded on March 31, 2006 at Book 23447, Page 1477, *et seq.* ("**Lake Covenant**"), such amenities shall cease to be Phase 1 Shared Areas under this Covenant to Share Costs and shall instead be administered pursuant to the Lake Covenant.

(b)    Phase 2 Shared Areas.    The "**Phase 2 Shared Areas**" consist of the following portions of the Phase 2 Property, whether or not owned by the Phase 2 Association:

(i)    all Common Areas, as defined in the Phase 2 Charter, except those portions of the Common Area designated as "Limited Common Area" pursuant to the Phase 2 Charter;

(ii)    all parcels designated as "Common Area" or "Open Space" on recorded plats of any portion of the Phase 2 Property;

(iii)    all rights-of-way and private roadways described on recorded plats of any portion of the Phase 1 Property, including any sidewalks, streetlights, landscaping, and irrigation systems within such rights-of-way and private roadways;

(iv)    community identification, traffic and directional signage within rights-of way or Common Area (as defined in the Phase 1 Charter) within the Phase 2 Property, except directional signage placed by the Phase 1 Declarant or the Phase 2 Declarant or their respective designees in connection with the marketing and sale of Units pursuant to subsection (c) ;

3

(v)      stormwater drainage, detention, and retention facilities and equipment within the Phase 2 Property which serve both the Phase 1 Property and the Phase 2 Property, if any; and

(vi)      all recreational facilities, parks, walking and nature trails, and other improvements designated by the Phase 2 Declarant as available for the common use and enjoyment of the Unit Owners.

The Phase 2 Shared Areas may be further and more particularly described by amendment to this Covenant to Share Costs to reference plats recorded from time to time in the Office of the Register of Deeds for Beaufort County, South Carolina ("**Public Records**"), against the Phase 2 Property.

**1.2.    Easements.**

(a)      Easements over Phase 1 Shared Areas – Phase 2 Association and Phase 2 Unit Owners. The Phase 1 Declarant and the Phase 1 Association hereby create and grant to the Phase 2 Association and the Phase 2 Unit Owners, a perpetual, non-exclusive easement for access, use, and enjoyment of the Phase 1 Shared Areas for the purposes for which they are designed, subject to such reasonable rules as the Phase 1 Association may adopt pursuant to the Phase 1 Charter.   Any rules imposed by the Phase 1 Association shall apply generally and equally to the Phase 2 Unit Owners and to the Phase 1 Unit Owners, and their respective family members and guests.   The rights conferred by this easement are subject to suspension in the event of non-payment of amounts due to the Phase 1 Association pursuant to Article III below, but shall not be subject to additional use or access fees, except to the extent such fees also are charged to Phase 1 Unit Owners.

The rights and easements granted and reserved under this Section 1.2(a) shall be subject to the following, provided that they are not applied in a manner which discriminates against Phase 2 Unit Owners:

(i)      the right of the Phase 1 Declarant and the Phase 1 Association to temporarily close all or portions of the Phase 1 Shared Areas in order to perform maintenance and repairs;

(ii)      the right of the Phase 1 Declarant and the Phase 1 Association to declare portions of the Phase 1 Shared Areas closed to access by persons other than maintenance or other personnel related to the operation of such areas; and

(iii)      all other easements and restrictions of record.

(b)      Easements over Phase 2 Shared Areas – Phase 1 Association and Phase 1 Unit Owners. The Phase 2 Declarant hereby creates and grants to the Phase 1 Association and the Phase 1 Unit Owners, a perpetual, non-exclusive easement for access, use, and enjoyment of the Phase 2 Shared Areas for the purposes for which they are designed, subject to such reasonable rules as the Phase 2 Association may adopt pursuant to the Phase 2 Charter.   Any rules imposed by the Phase 2 Association shall apply generally and equally to the Phase 1 Unit Owners and to the Phase 2 Unit Owners, and their respective family members and guests.   The rights conferred by this easement are subject to suspension in the event of non-payment of amounts due to the Phase 2 Association pursuant to Article III below, but shall not be subject to additional use or access fees, except to the extent such fees also are charged to Phase 1 Unit Owners.

The rights and easements granted and reserved under this Section 1.2(b) shall be subject to the following, provided that they are not applied in a manner which discriminates against Phase 1 Unit Owners:

4

(i)    the right of the Phase 2 Declarant and the Phase 2 Association to temporarily close all or portions of the Phase 2 Shared Areas in order to perform maintenance and repairs;

(ii)    the right of the Phase 2 Declarant and the Phase 2 Association to declare portions of the Phase 2 Shared Areas closed to access by persons other than maintenance or other personnel related to the operation of such areas; and

(iii)    all other easements and restrictions of record.

(c)    <u>Easements for Development, Marketing, and Sale Activities</u>.    The Phase 1 Declarant hereby creates and grants to the Phase 2 Declarant, for the benefit of the Phase 2 Declarant, its employees, contractors, subcontractors, suppliers, and invitees, non-exclusive easements for access, ingress, egress and use of roads and other Common Areas within the Phase 1 Shared Areas as may reasonably be required for the development, marketing, and sale of the Phase 2 Units.    Such easements shall include, without limitation, the right: (i) to tie in to roads within the Phase 1 Property to provide access to the Phase 2 Property; (ii) to tie in to utility lines, equipment, and facilities within the Phase 1 Property to install and obtain utility service to the Phase 2 Property; (iii) to tie in to stormwater drainage pipes, lines and facilities within the Phase 1 Property to facilitate the drainage and flow of stormwater from the Phase 2 Property into facilities within the Phase 1 Property and vice versa; (iv) to place directional signage in the right-of-way of roadways in connection with the marketing and sale of the Phase 2 Units; and (v) to conduct tours of the community for prospective purchasers of any portion of the Phase 2 Property and real estate brokers and agents.    Notwithstanding the foregoing, the rights provided above shall be limited to the extent that the existing improvements are suited to accommodate the addition of the Phase 2 Property.    In the event the existing improvements are insufficient to accommodate the addition of the Phase 2 Property, the Phase 2 Declarant may elect to upgrade or otherwise improve the existing improvements at its sole expense in order to exercise its rights pursuant to this Section 1.2(c).    Any costs and expenses associated with the exercise of the foregoing rights, including the costs of governmental or other third party approvals, shall be borne solely by the Phase 2 Declarant and shall not be considered Shared Expenses.

The Phase 2 Declarant hereby creates and grants to the Phase 1 Declarant non-exclusive easements for access, ingress, egress and use of roads and other Common Areas within the Phase 2 Shared Areas as may reasonably be required, convenient, or incidental to the development, marketing, and sale of the Phase 1 Units.    Such easements shall include, without limitation, the right (i) to tie in to utility lines, equipment, and facilities within the Phase 2 Property to install and obtain utility service to the Phase 1 Property; (ii) to place directional signage in the right-of-way of roadways in connection with the marketing and sale of the Phase 1 Units; (iii) to tie in to stormwater drainage pipes, lines and facilities within the Phase 1 Property to facilitate the drainage and flow of stormwater from the Phase 1 Property into facilities within the Phase 2 Property and vice versa; and (iv) to conduct tours of the community for prospective purchasers of any portion of the Phase 1 Property and real estate brokers and agents.

All work associated with the exercise of the easements described in this Section 1.2(c) shall be performed in such a manner as to avoid or, if such interference cannot reasonably be avoided, to minimize, interference with the use and enjoyment of the burdened property.    Upon completion of the work or sooner upon the demand of the other Association or Declarant if the condition of the property presents a hazard or will result in further deterioration over time if not repaired prior to completion of the work, the person exercising the easement shall promptly restore the property, to the extent reasonably possible, to its condition prior to the commencement of the work at such person's sole expense.

The quality and design of any directional signage placed in the rights-of-way of roadways pursuant to this Section 1.2(c) shall be consistent with the signage guidelines and standards in place for the Phase 1 Property as of the date of recording of this Covenant to Share Costs, unless otherwise agreed in writing by the Phase 1 Declarant and the Phase 2 Declarant.

Notwithstanding anything herein to the contrary, the Phase 1 Declarant reserves the right to restrict or prohibit marketing and sales activities on the Phase 1 Property except tours of the community including the amenities and Common Areas therein.

(d)      Cross-Drainage Easements.   There are hereby established perpetual reciprocal easements over the Phase 1 Shared Areas and the Phase 2 Shared Areas for purposes of the flow of stormwater through and retention and detention of stormwater in all pipes, lines, and facilities comprising any portion of the stormwater management system serving the Phase 1 Property or the Phase 2 Property to the extent the existing stormwater management system servicing the Phase 1 Property can accommodate the addition of the Phase 2 Property.   Any costs and expenses associated with the exercise of these easement rights, including any improvements to the stormwater management system to accommodate the addition of the Phase 2 Property, shall be borne by the Phase 2 Declarant.

## Article II
## Obligation to Maintain, Operate and Insure Shared Areas

**2.1.      Maintenance and Operation; Community-Wide Standard.**

The Phase 1 Association shall maintain and operate the Phase 1 Shared Areas (regardless of ownership unless owned by the Lake Maintenance Corporation pursuant to Section 1.1(a) hereof), and the Phase 2 Association shall maintain and operate the Phase 2 Shared Areas (regardless of ownership unless owned by the Lake Maintenance Corporation).   The Associations shall maintain their respective Shared Areas in good condition and repair, in a manner which meets or exceeds the "Community-Wide Standard" established pursuant to the Phase 1 Charter; provided, such Community-Wide Standard may not be lowered or diminished from the standard which exists as of the date of recording of this Covenant to Share Costs without the written consent of each of (i) the Phase 1 Declarant, for so long as it continues to own real property subject to the Phase 1 Charter, and, thereafter, the Phase 1 Association, and (ii) the Phase 2 Declarant for so long as it continues to own any portion of the Phase 2 Property, and thereafter, the Phase 2 Association.

Maintenance, as such term is used in this Covenant to Share Costs, includes responsibility for repair and replacement as necessary to maintain the Shared Areas to a level consistent with the Community-Wide Standard described herein, except that neither Association shall be responsible for repair or replacement of improvements necessitated by damage or destruction resulting from causes other than normal wear and tear, except to the extent that such Association is responsible for insuring such improvements.

**2.2.      Obligation to Insure.**

Each Association shall maintain property insurance and commercial general liability insurance on the Shared Areas subject to their control with such coverages and in such amounts as meet or exceed the Phase 1 Association's responsibility for insuring Common Areas under the Phase 1 Charter, but such

insurance coverage shall be not less than that required to be maintained as of the date of recording this Covenant to Share Costs. The liability policies required to be maintained by each Association under this Section shall identify the other Association as an additional named insured.  Each Association shall cause its insurer to issue to the other Association from time to time upon its request a certificate or certificates evidencing that it has in effect such insurance as it is required to maintain under this section.

2.3.    **Dispute Procedures.**

(a)    In the event that (i) the Phase 1 Declarant or the Phase 1 Association, with respect to the Phase 2 Shared Areas, or (ii) the Phase 2 Declarant or the Phase 2 Association, with respect to the Phase 1 Shared Areas, believes that any portion of the Shared Areas is not being maintained to the Community-Wide Standard, such party ("**Complaining Party**") shall provide written notice ("**Notice**") to the Phase 1 Association or the Phase 2 Association, as applicable ("**Responding Party**"), which Notice shall state plainly and concisely:

(1)    the nature of the deficiency, including any specific problems with the level, quality, or frequency of maintenance being performed, and examples of where maintenance of a similar nature, if any, is being performed within Hampton Lake to the Community-Wide Standard; and

(2)    what the Complaining Party wants the Responding Party to do to resolve or cure the maintenance deficiency.

(b)    The Responding Party shall have 10 business days after receipt of the Notice to (i) respond to the Complaining Party by stating its opinion that the Community-Wide Standard is satisfied; (ii) curing the alleged deficiency; or (iii) if the deficiency is not capable of being cured within such period, provide the Complaining Party with a written explanation of the steps being taken to cure the deficiency, a good faith estimate of a reasonable date by which such deficiency shall be cured, and any other pertinent information.

(c)    If the Responding Party contests any alleged deficiency or acknowledges the deficiency but fails to cure the deficiency within 10 business days after receipt of the Notice or such reasonable cure date as the Responding Party has specified in its response under subsection (b)(iii), the Complaining Party may file a "**Claim**" as provided in, and subject to the limitations on Claims set forth in, the alternative dispute resolution provisions in Chapter 18 of the Phase 1 Charter.   In such case, the Complaining Party and the Responding Party shall be deemed "**Bound Parties**" and shall comply with the dispute resolution procedures set forth in the Phase 1 Charter, to the extent that the Claim would not be exempt thereunder, prior to filing any suit.

2.4.    **Limitation of Liability.**

Notwithstanding anything contained herein to the contrary, neither the Phase 1 Association nor the Phase 2 Association shall be liable for property damage or personal injury occurring on, or arising out of the condition of, property which it does not own unless, and then only to the extent that, such damage or injury is the direct result of its negligence in the performance of its maintenance responsibilities hereunder.

## Article III
## Obligation to Share Costs

3.1.    **Allocation of Shared Expenses.**

All costs incurred by the Associations in performing their respective responsibilities under this Covenant to Share Costs, including costs of maintaining, repairing, replacing, operating and insuring the Shared Areas, a reasonable contribution to a reserve fund for repair and replacement of capital items within the Shared Areas, personnel costs for staffing facilities which require staffing, costs of utilities to serve the Shared Areas, as applicable, and such reasonable management fee as the boards of directors of the Associations may agree that each may charge, shall constitute "**Shared Expenses.**"

On an annual basis, each Association shall prepare and adopt a budget ("**Shared Expense Budget**") reflecting the estimated Shared Expenses which it expects to incur in performing its responsibilities under this Covenant to Share Costs during the upcoming calendar year, including such reasonable amounts, if any, as the Association's board of directors determines, in its discretion, should be placed in a reserve fund for capital repairs and replacements to the Shared Areas for which it is responsible.   Such Shared Expense Budget shall also reflect any estimated income from operations of such Shared Areas (*e.g.*, rents, rental fees, use fees, concessions, etc.) and any excess or deficiency in the Shared Expense Budget for the immediately preceding year as compared to actual income and expenses for that period.   Such Shared Expense Budget may also include any unreimbursed costs such Association incurred during the previous fiscal year to collect amounts due from the other Association hereunder.   Each Association shall provide a copy of its Shared Expense Budget to the other Association at least 60 days prior to the effective date of such budget.

The total of all Shared Expenses, less any income generated by Associations from the Shared Areas (e.g., rents, rental fees, use fees, concessions, etc.) ("**Net Shared Expenses**"), shall be allocated between the Phase 1 Association and the Phase 2 Association in the same proportion as the number of Assessable Units subject to assessment by each bears to the total number of "Assessable Units" within the Phase 1 Property and the Phase 2 Property as of the effective date of such budget.   A Unit shall become an "**Assessable Unit**" at such time as title to the Unit vests in a person or entity other than: the Phase 1 Declarant or the Phase 2 Declarant or their successors or assigns (a "**Declarant**"); an entity which is owned or controlled by, or owns or controls, or is under common ownership or control with, a Declarant (a "**Declarant Affiliate**"); or a builder designated by a Declarant who is holding title for the purposes of development and sale in the ordinary course of its business.

No Shared Expenses will be due or payable relating to the Phase 2 Property unless and until such time as there exists an Assessable Unit within the Phase 2 Property.   Any costs and expenses associate with the Phase 2 Property, including the Phase 2 Shared Areas, prior to such date shall not be considered Shared Expenses and shall be borne by the Phase 2 Declarant.

That portion of the Net Shared Expenses allocated to each Association under this section shall be treated as a "Common Expense" of such Association under the Phase 1 Charter or the Phase 2 Charter, as applicable (hereafter, its "**Charter**"), and shall be included in such Association's annual operating budget and the annual assessment levied against all Units subject to assessment by it under its Charter.   Each Association shall be responsible for paying to the other Association that amount, if any, by which its share of the Net Shared Expenses exceeds the Net Shared Expenses under its Shared Expense Budget (the "**Shared Expense Assessment**"), whether or not it successfully collects all assessments due from its members in accordance with its assessment authority under its Charter.   Any Shared Expense Assessment due

hereunder shall be paid in semi-annual installments on or before June 1 and December 31 of the calendar year for which it is due, unless otherwise agreed by the Association to which it is payable.

The obligation of each Association to pay any such Shared Expense Assessment pursuant to this Covenant to Share Costs shall be a separate and independent covenant on the part of each Association. No diminution or abatement of assessments or setoff shall be claimed or allowed by reason of any alleged failure of either the Phase 1 Association or the Phase 2 Association to perform its responsibilities hereunder, the sole remedy for failure of the Phase 1 Association or Phase 2 Association to perform its responsibilities being to invoke the dispute procedures provided for in this Covenant to Share Costs.

### 3.2.    Payment of Assessments.

Any Shared Expense Assessment or portion thereof which remains due more than 30 days after the due date shall incur late charges (in the amount of 10% of the delinquent amount) and interest at a rate of 18% per annum (or, if lower, the highest rate allowed by South Carolina law) on the principal amount due until paid.   Each Association shall be entitled to collect from the other Association all costs of collection (including attorneys fees), and any other amounts provided or permitted by law.   All payments shall be applied first to costs and attorneys fees, then to interest, and then to delinquent assessments.

If any Shared Expense Assessment or portion thereof remains unpaid 60 days after the due date thereof, the Association to which amounts are owed may institute suit to obtain a money judgment for such amounts, and/or file a lien against the Shared Areas controlled by the delinquent Association, which shall be superior to all other liens, except (a) the liens of all taxes, bonds, assessments, and other levies which by law would be superior, and (b) the lien or charge of any recorded mortgage made in good faith and for value having first priority over any other mortgages on such Unit.   **Such lien may be foreclosed in the same manner as any mortgage on real property.**   Although no further action is required to create or perfect the lien, an Association may, as further evidence and notice of the lien, execute and record a document setting forth the amount due the Association at the time such document is executed and the fact that a lien exists to secure the repayment thereof.   However, the failure of the Association to execute and record any such document shall not affect the validity, enforceability, or priority of the lien.

All amounts collected by an Association for Shared Expenses shall be held by such Association in a separate account ("**Shared Areas Account**") established specifically for the payment of Shared Expenses with respect to the Shared Areas under its control and shall be used exclusively for such purpose.

Disputes over the payment of assessments shall not be subject to the dispute resolution procedures set forth in Section 2.3.

### 3.3.    Recordkeeping.

Within 10 days after receipt of a written request from one Association to the other, an Association shall provide to the other a current list of the Unit Owners and their mailing addresses as shown on the Association's records.

Each Association shall maintain or cause to be maintained full and accurate books of account with respect to the performance of its responsibilities hereunder and shall retain copies of such books of account for a minimum period of seven years.   Each Association shall make books, records, and related financial statements available for inspection and copying during normal business hours by an authorized representative of the other Association and its members.   The party requesting copies shall pay copying

9

charges when requesting copies.    If a party desires to have the records audited, it may do so at its expense, and the Association whose Shared Areas Account is being audited shall cooperate by making available to the auditors the records, including all supporting material (*e.g.*, check copies, invoices, etc.), for the year(s) in question.

If the amount of actual expenses for the year is disputed after an audit, the parties shall cause a second audit to be performed by a mutually acceptable auditor, and the decision of the second auditor shall be binding.    If the amount as determined by the second auditor varies from the amount asserted by the Association being audited by 5% or more, such Association shall pay the entire cost of the second auditor. If the amount as determined by the second auditor varies from the amount asserted by the Association requesting the audit by less than 3%, the party requesting the audit shall pay the entire cost of the second auditor.    Otherwise, the parties shall share equally the cost of the second auditor.    Variances shall be taken into account in the following year's Budget as provided in Section 3.2.

## Article IV
## General

4.1.    **Notice.**

Any notice provided for in this Covenant to Share Costs shall be served personally or shall be mailed by registered or certified mail to:

(a)    the Phase 1 Declarant's principal place of business as it appears on the South Carolina's Secretary of State's records, or such other address as it designates in writing to the other parties and to the Phase 2 Association;

(b)    the Phase 2 Declarant's principal place of business as it appears on the South Carolina's Secretary of State's records, or such other address as it designates in writing to the other parties and to the Phase 2 Association;

(c)    the president or secretary of the Phase 1 Association at its principal office or such other address as it designates in writing to the other parties and to the Phase 2 Association;

(d)    to the president or secretary of the Phase 2 Association at the address of its principal office or such other address as it designates in writing to the Phase 1 Association; and

(e)    Unit Owners at the address of the Unit Owner's Unit, or such other address as the Unit Owner designates in writing to the Association of which it is a member.

All such notices shall, for all purposes, be deemed delivered (a) upon personal delivery to the party at the address specified above or (b) on the third day after mailing when mailed by registered, certified, or first class mail, postage prepaid, and properly addressed.

4.2.    **Successors and Assigns.**

An assignment or pledge as security by the Phase 1 Declarant of the rights, obligations, and status of the "Declarant" under the Phase 1 Charter shall operate to pledge or to assign to and vest in the assignee of such Declarant rights, obligations, and status all rights, powers, and obligations of the Phase 1 Declarant hereunder.    The Phase 2 Declarant may assign its rights and obligations hereunder to any person who

takes title to any portion of the Phase 2 Property for the purpose of development and/or sale; such assignment shall be made only in an instrument signed by both assignor and assignee and recorded in the Public Records.   This Covenant to Share Costs shall not confer any rights or remedies upon any third party except as specifically set forth herein.

### 4.3.    Enforcement.

The obligations created hereunder shall inure to the benefit of, and shall be enforceable by, the Phase 1 Declarant, the Phase 1 Association, the Phase 2 Declarant, the Phase 2 Association, and each Unit Owner; provided, any action to enforce an Association's obligations under Section 2.1 shall be subject to the procedures outlined in Section 2.3.

### 4.4.    Amendment.

The Phase 2 Declarant may amend this Covenant to Share Costs at any time to more particularly identify Phase 2 Shared Areas with the written consent of the Phase 1 Declarant during the "Development and Sale Period" (as defined in the Phase 1 Charter) or, thereafter, the written consent of the Phase 1 Association's board of directors; provided, the consent of the Phase 1 Declarant or the Phase 1 Association's board of directors to such amendment shall not unreasonably be withheld, conditioned, or delayed.

This Covenant to Share Costs also may be amended or terminated upon the prior written consent of all of the following: (a) the Phase 1 Declarant during the "Development and Sale Period" (as defined in the Phase 1 Charter); (b) the Phase 2 Declarant, for so long as the Phase 2 Declarant or any of Declarant Affiliate (as defined in Section 3.1 relative to the Phase 2 Declarant) owns any portion of the Phase 2 Property; (c) the Phase 1 Association's board of directors; (d) the Phase 2 Association's board of directors; and (e) the mortgagee under the Mortgage (as defined below) until such time as the Mortgage is satisfied of record.

Amendments to this Covenant to Share Costs shall become effective upon recordation in the Public Records, unless a later effective date is specified therein.   Any procedural challenge to an amendment must be made within six months of its recordation or such amendment shall be presumed to have been validly adopted.   In no event shall a change of conditions or circumstances operate to amend any provision of this Covenant to Share Costs.

### 4.5.    Duration.

Unless limited by South Carolina law, this Covenant to Share Costs shall run with and bind the Phase 1 Shared Areas and the Phase 2 Property for a period of 30 years and thereafter shall automatically be extended for successive periods of 10 years each, subject to the right to amend or terminate by amendment pursuant to Section 4.5 or termination as provided in this Section 4.6.   If South Carolina law hereafter limits the period during which covenants may run with the land, then to the extent consistent with such law, this Covenant to Share Costs shall run with title to and bind the Phase 1 Shared Areas and the Phase 2 Property for the maximum period permitted under South Carolina law.

This Covenant to Share Costs may be terminated by the Phase 2 Declarant in the event that (a) the mortgage encumbering all or a portion of the Phase 1 Property in favor of Crimson Portfolio, LLC and referenced in the Mortgagee Joinder and Consent attached hereto ("**Mortgage**"), is satisfied of record; and (b) the Phase 2 Property is either owned by the Phase 2 Declarant or made subject to the Phase 1 Charter. In addition, this Covenant to Share Costs shall terminate automatically in the event of the satisfaction of

11

record of the Mortgage and the merger of the Phase 1 Association and the Phase 2 Association in accordance with South Carolina law.

**4.6.    Interpretation.**

This Covenant to Share Costs shall be governed by and construed under South Carolina law.

**4.7.    Waiver.**

No failure of any party to exercise any power under this Covenant to Share Costs or insist upon strict compliance with this Covenant to Share Costs and no custom or practice at variance with the terms of this Covenant to Share Costs shall constitute a waiver of the right to demand exact compliance with the terms of this Covenant to Share Costs.

**4.8.    Severability.**

Invalidation of any provision of this Covenant to Share Costs, in whole or in part, or any application of a provision of this Covenant to Share Costs by judgment or court order shall in no way affect other provisions or applications.

**4.9.    Captions.**

The captions of each Article and Section hereof, as to the contents of each Article and Section, are inserted only for convenience and are in no way to be construed as defining, limiting, extending, or otherwise modifying or adding to the particular Article or Section to which they refer.

[continued on next page]

IN WITNESS WHEREOF, the undersigned have executed this Covenant to Share Costs this _____ day of _____, 2013.

**PHASE 1 DECLARANT:**    HAMPTON LAKE, LLC,
                          a South Carolina limited liability company      [SEAL]

                          By:    _____
                          Name:  _____
                          Its:   _____

Signed, sealed and delivered in
the presence of:


_____
Witness #1


_____
Witness #2

STATE OF SOUTH CAROLINA      §
                             §
COUNTY OF BEAUFORT           §

I, a Notary Public for South Carolina, do hereby certify that _____, the _____ of Hampton Lake, LLC, a South Carolina limited liability company, personally appeared before me this day and acknowledged the due execution of the foregoing instrument on behalf of said company.

Witness my hand and official seal this the ___ day of _____, 2013.


                          _____
                          Notary Public, State of South Carolina

[Notarial Seal]
                          My commission expires:   _____

[Signatures continue on the following page]

13

**PHASE 1 ASSOCIATION:**  **HAMPTON LAKE COMMUNITY ASSOCIATION, INC.,**

a South Carolina nonprofit corporation        [SEAL]

By: _____

Name: _____

Its: _____


Attest: _____

Name: _____

Its: _____

Signed, sealed and delivered in
the presence of:


_____

Witness #1


_____

Witness #2


STATE OF SOUTH CAROLINA        §

                              §

COUNTY OF BEAUFORT            §

I, a Notary Public for South Carolina, do hereby certify that _____, the _____ of Hampton Lake Community Association, Inc., a South Carolina nonprofit corporation, personally appeared before me this day and acknowledged the due execution of the foregoing instrument on behalf of said company.

Witness my hand and official seal this the ___ day of _____, 2013.


                                    _____

                                    Notary Public, State of South Carolina

[Notarial Seal]

                                    My commission expires:  _____


[Signatures continue on the following page]

15

PHASE 2 DECLARANT:    **JPR PROPERTIES, INC.**, a South Carolina
corporation                                          [SEAL]

By:    _____

Name:  _____

Its:   _____

Signed, sealed and delivered in
the presence of:


_____
Witness #1


_____
Witness #2

STATE OF SOUTH CAROLINA          §
                                 §
COUNTY OF BEAUFORT               §

I, a Notary Public for South Carolina, do hereby certify that _____, the
_____ of JPR Properties, Inc., a South Carolina corporation,
personally appeared before me this day and acknowledged the due execution of the foregoing instrument
on behalf of said company.

Witness my hand and official seal this the ___ day of _____, 2013.


                                          _____
                                          Notary Public, State of South Carolina

[Notarial Seal]
                                          My commission expires:  _____

16

## CONSENT AND SUBORDINATION OF MORTGAGEE

The undersigned holder of that certain Mortgage from Hampton Lake, LLC, as Mortgagor, to Synovus Bank, a Georgia bank, formerly known as Columbus Bank and Trust Company, as successor in interest through name change and by merger with The National Bank of South Carolina, as Mortgagee, and recorded in the Office of the Register of Deeds of Beaufort County, South Carolina in Book 2277 at Page 1355, as modified in Book 2741 at Page 569, Book 2835 at Page 819, Book 2941 at Page 299, Book 2996 at Page 1789, Book 2996 at Page 1782 as re-recorded in Book 3045 at Page 697, Book 3014 at Page 2219, Book 3081 at Page 2689, Book 3155 at Page 754, and Book 3155 at Page 748, and as assigned to Crimson Portfolio, LLC, a Delaware limited liability company pursuant to the Assignment of Security Instrument dated December 10, 2012 and recorded on February 27, 2013 in Book 3218 at Page 2952, *et seq.* (the "**Mortgage**"), which Mortgage encumbers the property described as the "Phase 1 Property" in this Declaration of Easements and Covenant to Share Costs ("**Covenant to Share Costs**"), hereby joins in the execution of this Covenant to Share Costs to evidence its consent to the same and to subordinate its interest under the Mortgage to this Covenant to Share Costs, provided that pursuant to its terms, such Covenant to Share Costs may only be modified or amended with the prior written consent of the undersigned.

Executed by and through its authorized representative this _____ day of _____, 2013.

|  |  |
|---|---|
| **MORTGAGEE:** | **CRIMSON PORTFOLIO, LLC,** <br> a Delaware limited liability company |

By:    _____
Name: _____
Its:     _____

Signed, sealed and delivered in
the presence of:

_____
Witness #1

_____
Witness #2

STATE OF SOUTH CAROLINA          §
                                                          §
COUNTY OF BEAUFORT                    §

I, a Notary Public for South Carolina, do hereby certify that _____, as _____ of SABAL Financial Group, L.P., authorized agent of Crimson Portfolio, LLC, personally appeared before me this day and acknowledged the due execution of the foregoing instrument on behalf of said company.

Witness my hand and official seal this the ___ day of _____, 2013.

_____

[Notarial Seal]

Notary Public, State of South Carolina

My commission expires:   _____

## EXHIBIT "A"

## <u>Potential Phase 2 Property</u>

ALL that certain piece, parcel or tract of land, lying and being in the Town of Bluffton, Beaufort County, South Carolina, containing 411.432 acres, more or less, and being depicted and shown as "SANDHILL TRACT 1A" on that certain plat entitled, "A Plat of A 1746.952 Acre Portion Of The Southwest Tract Formerly Known As A Portion Of The Buckwalter Tract And Jones Estate", prepared by Boyce L. Young, SCRLS No. 11079, of Thomas & Hutton Engineering Co., dated November 30, 2004 and recorded in the Office of the Register of Deeds for Beaufort County, South Carolina on December 14, 2004 in Plat Book 103 at Page 58. For a more complete description of said property, reference may be had to said plat of record.

.

EXHIBIT "B"

## Phase 1 Shared Areas

The Phase 1 Shared Areas shall include all Rights Of Way/Roadways, Common Area, Open Space and other properties described in Section 1.1(a) lying within the property described on the following plats as recorded in the office of the Register of Deeds of Beaufort County, South Carolina:

- that plat entitled "A Plat of Hampton Lake Phase 1 lots, Beaufort County, South Carolina", dated October 31, 2005, prepared by Boyce L. Young, SCRLS No. 11079, of Thomas & Hutton Engineering Co., and recorded in Plat Book 111 at Page 18;
- that plat entitled "A Plat of Hampton Lake Phase 1A Lots, Beaufort County, South Carolina", dated April 6, 2006 and prepared by Boyce L. Young, SCRLS No. 11079, of Thomas & Hutton Engineering Co. and recorded in Plat Book 114 at Pages 88-90;
- that plat entitled "A Plat of Hampton Lake Phase 1B Lots, Beaufort County, South Carolina", dated April 29, 2006 and prepared by Boyce L. Young, SCRLS No. 11079, of Thomas & Hutton Engineering Co. and recorded in Plat Book 116 at Pages 33;
- that plat entitled "A Plat of Hampton Lake Tract 4", dated August 9, 2006 and prepared by Boyce L. Young, SCRLS No. 11079, of Thomas & Hutton Engineering Co. and recorded in Plat Book 116 at Page 30;
- that Plat entitled "A Plat of Hampton Lake Tract 5", last revised on August 9, 2006 and prepared by Boyce L. Young, SCRLS No. 11079, of Thomas & Hutton Engineering Co. and recorded in Plat Book 116 at Page 31;
- that plat entitled "A Plat of Hampton Lake Tract 6", last revised on September 13, 2006 and prepared by Boyce L. Young, SCRLS No. 11079, of Thomas & Hutton Engineering Co. and recorded in Plat Book 116 at Page 32;
- that plat entitled "A Plat of Hampton Lake Phase 2 Lots, Beaufort County, South Carolina", last revised November 6, 2006 and prepared by Boyce L. Young, SCRLS No. 11079, of Thomas & Hutton Engineering Co. and recorded in Plat Book 118 at Pages 9-18;
- that plat entitled "A Plat of Hampton Lake Phase 1C Tract 15, Beaufort County, South Carolina", last revised on December 18, 2006 and prepared by Boyce L. Young, SCRLS No. 11079, of Thomas & Hutton Engineering Co. and recorded in Plat Book 118 at Page 24;
- that plat entitled "A Plat of Hampton Lake Phase 1B-1 Lots, Lots 606-612, Beaufort County, South Carolina", dated January 18, 2007 and prepared by Boyce L. Young, SCRLS No. 11079, of Thomas & Hutton Engineering Co. and recorded in Plat Book 118 at Pages 42-43; and
- that plat entitled " A Plat of Hampton Lake Phase 2 Lots, Town of Bluffton, Beaufort County, South Carolina", last revised on May 1, 2008 and prepared by Boyce L. Young, SCRLS No. 11079, of Thomas & Hutton Engineering Co. and recorded in Plat Book 125 at Pages 16-25;

including, without limitation, the following rights of way/roadways: Hampton Lake Drive, Anchor Bay Court, Anchor Cove Court, Hampton Lake Crossing, Hampton Lake Lane, Palmetto Cove Court, Heartwood Court, Grassy Coup Court, Balsam Bay Court, Lakewood Court, Driftwood Court, Driftwood Place, Harborage Court, Fording Court, Fording Bend, Fording Trace, Mooring Line Place, Mooring Line Court, Sweet Pond Court, Sweet Marsh Court, Waterview Court, Fishdancer Court, Little Pine Court, Green Trail Court, Blue Trail Court and Pine Shadow Court.

EXHIBIT "C"

**Master Plan**

[see attached]

The attached master plan is shown for general illustrative purposes only and no representation is made that it accurately reflects actual as-built conditions, locations, or design.   All elements of the master plan are subject to change without notice.